## NATIONAL LABOR RELATIONS BOARD v. E. C. ATKINS & CO.

### No. 8669.

Circuit Court of Appeals, Seventh Circuit.

Feb. 27, 1945.

Frank Donner, Marcel Mallet-Prevost, Owsley Vose, Thomas B. Sweeney, Alvin J. Rockwell, and Malcolm F. Halliday, all of Washington, D. C., for petitioner.

Roscoe Pound, of Cambridge, Mass., Kurt F. Pantzer, and Barnes, Hickam, Pantzer & Boyd, all of Indianapolis, Ind. (George Rose, Lewis D. Spencer, and John L. Ketcham, all of Indianapolis, Ind., of counsel), for respondent.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This case is here on petition of the National Labor Relations Board for enforcement of its order issued May 30, 1944, against respondent, pursuant to Sec. 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c). The Board, upon a charge filed by the International Association of Machinists, District 90, and its affiliate Local 1683 (hereinafter called the Union), issued its complaint charging that respondent had violated Section 8(5) and (1) of the Act, 29 U.S.C.A. § 158(5 and 1). In its answer to the Board's complaint, respondent admitted that it had refused to bargain collectively with the Union, as alleged in the complaint, but urged that members of the unit for whom the Union sought to bargain were not employes of respondent within the meaning of the Act, and that consequently its refusal to bargain did not constitute a violation. The Board decided adversely to respondent and entered its cease and desist order now sought to be enforced.

No evidence was offered by either of the parties at the hearing on the unfair labor practice charge; however, it was stipulated that the evidence which had theretofore been offered in a representation proceeding should be considered. In this latter proceeding, instituted by the Union on October 19, 1943, it was determined by the Board that the militarized plant guards at respondent's plants were employes within the meaning of the Act and that, excluding certain supervisory employes, they constituted an appropriate bargaining unit within the meaning of Section 9 of the Act, 29 U.S.C.A. § 159. The Board accordingly directed that an election be held among the employes in said unit. Following the election, the Board on Novem-

ber 29, 1943, certified the Union as the exclusive bargaining representative for such employes.

The primary issue now presented, stripped of all camouflage, is whether the members of the unit for whom the Union sought to bargain were employes of respondent within the meaning of Section 2(2) and (3) of the Act, 29 U.S.C.A. § 152(2 and 3). It is also contended by respondent that even though the position of the Board be sustained in this respect, its order should not be enforced, on the ground that its enforcement would not effectuate the policies of the Act.

■ Respondent urgently insists that the findings of the Board are insufficient to support its order, and particularly that at no time has the Board made a specific finding on the issue as to whether the members of the bargaining unit are its employes within the meaning of the Act. While there is some merit in this criticism, it cannot be doubted but that the Board determined such issue adversely to respondent and that respondent was aware of such determination. Respondent also contends that the Board was without authority in the unfair labor practice case to make findings in addition to those made in the representation case. It is true, as already stated, that no additional evidence was offered in the latter case but, nevertheless, we are of the view that the Board, with the record of both proceedings before it, had a right to make such further findings as it deemed appropriate.

■ We are of the view, also, that the findings contained in its decision in the unfair labor practice case, if substantially supported, are sufficient to support its order. In studying this record for the purpose of ascertaining if such support is present, we are not unmindful of the admonition so often repeated that a court is not permitted to weigh the evidence and substitute its judgment for that of the Board. As stated in the recent case of National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 130, 64 S. Ct. 851, 860: "Hence in reviewing the Board's ultimate conclusions, it is not the court's function to substitute its own inferences of fact for the Board's, when the latter have support in the record."

The Hearst case is strongly relied upon by the Board. It is true that the issue there decided, that is, whether the members, of the unit which sought the right to bargain were employes within the meaning of the Act, was the same as the issue in the instant case. The facts of that case, however, are so widely different from those of the instant case that it is of little, if any, assistance here. It is pertinent to note that the court was particular to point out in detail the vast amount of control which the publisher had over the newsboys in question. The court also recognized that many forms of service relationship are not within the meaning of the Act. It stated at page 126 of 322 U.S., at page 858 of 64 S.Ct.: "Large numbers will fall clearly on one side or on the other, by whatever test may be applied. But intermediate there will be many, the incidents of whose employment partake in part of the one group, in part of the other, in varying proportions of weight. And consequently the legal pendulum, for purposes of applying the statute, may swing one way or the other, depending upon the weight of this balance and its relation to the special purpose at hand."

■ Therefore, we are of the view that the decision in the Hearst case requires rather than precludes a review of the facts in the instant case, with a view of ascertaining if they reasonably support the Board's order. Furthermore, we are of the view that common-law tests are not to be ignored, although not exclusively controlling, and that any test utilized must be consistent with the purposes of the Act.

Respondent is a corporation operating two plants in Indianapolis, Indiana. One of such plants (referred to as the Main Plant) has been owned and operated by respondent since 1857; the other (referred to as Fall Creek Ordnance Plant) is owned by the federal government and was constructed for war purposes. Respondent operates the latter under a lease from the federal government, the terms and conditions of which are confidential for military reasons. The latter is a military reservation, and the Main Plant is listed by the government as a restricted area under government supervision.

Since 1941, respondent has been engaged exclusively in the manufacture of armor plate for the federal government. Prior thereto, it was engaged in the production of saws and saw tools at the Main Plant. At that time respondent had as its employes some fifty-nine sawsmiths who for a period of over forty years had been or-

ganized by and were members of the Saw-smiths Federal Labor Union No. 18548 (sometimes referred to as the Federal Local), and 1,208 production and maintenance employes who had since 1937 been members of United Steel Workers of America, Local 1543, affiliated with the C.I.O. (sometimes referred to as the C.I.O. Local). Respondent also had four employes, designated as watchmen, who were not members of any Union. Two of these employes worked on the night shift and two on the day shift. The duties of the former were to check the eighty-two night clocks in the plant, and those of the latter to watch or guard the gates of the plant. These four jobs were known as "pensioners' jobs."

The authority for the establishment of a plant guard system flows from Executive Order 8972, issued by the President of the United States on December 12, 1941. The order is entitled: "Authorizing The Secretary Of War And The Secretary Of The Navy To Establish And Maintain Military Guard And Patrols, And To Take Other Appropriate Measures, To Protect Certain National-Defense Material, Premises, And Utilities From Injury Or Destruction." The resolution, after reciting the situation pertaining to the crisis confronting the government as a result of war, states: "Therefore, by virtue of the authority vested in me as President of the United States, and Commander-in-Chief of the Army and Navy of the United States, I hereby authorize and direct the Secretary of War, whenever he deems such action to be necessary or desirable, * * * to establish and maintain military guards and patrols, and to take other appropriate measures, to protect from injury or destruction national-defense material, national-defense premises, and national-defense utilities * * *."

It is to be noted that the purpose for which a plant guard system was to be inaugurated is clearly stated in this executive proclamation.

In conformity with such order, there was issued by the War Department under date of July 2, 1942, a proclamation entitled "Military Organization of Plant Guard Forces," which provided in part:

"Guard forces at all War Department plants * * * are to be organized, drilled and instructed as military units subject to the Articles of War.

"These guard forces will be organized as a civilian auxiliary to the Military Police in all ammunition plants and plants where the possibility of sabotage is greatest * * *.

"At the time any guard force is organized as a civilian auxiliary to the Military Police, the commanding officer having jurisdiction over the guard force will:

"a. Cause the Articles of War prescribed by Article 110 thereof to be read and explained to each member of the guard force;

"b. Issue orders and regulations setting forth the duties and responsibilities of the guard force;

"c. Organize each guard force with a member of the Army of the United States in command and cause each force to be drilled and instructed with a view to supplementing the Army in resisting attack on war material, war premises, and war utilities which the force is assigned to guard.

"d. Require each member of the guard force to give a pledge of loyalty to the United States, and to execute an agreement acknowledging that such Articles of War are understood by him and that he is subject to military law as long as he remains a member of the guard force. (A draft of a form of such agreement is attached.)"

The form of agreement is entitled, "Agreement between the United States of America and ................." The pro-
(Plant Guard)
posed agreement states that the government is approving the employment of guards "for the purpose of guarding and protecting war material, war premises and war utilities from injury or destruction by the enemy or otherwise, including the making of arrests, as peace officers for violations of Federal laws, as well as for violations of orders and regulations issued by military authority." The proposed agreement then provides:

"Now, therefore, I, ......, who have been or am about to be employed by ...... as a guard at ...... for the purpose of guarding certain war material, war premises, and war utilities, in consideration of my employment or the continuation of my employment, do agree with the United States of America that:

"(1) I will support and defend the Constitution of the United States against all enemies, foreign and domestic;

"(2) I will bear true faith and allegiance to the Constitution of the United States;

"(3) I will well and faithfully discharge my duty as a civilian auxiliary to the mili-

tary police to protect war material, war premises, and war utilities against all enemies, foreign and domestic, and will obey any orders issued in connection therewith by the President, as Commander-in-Chief of the Army and Navy of the United States, and by his duly authorized officers;

"(4) I acknowledge that the appropriate Articles of War have been read and explained to me, and that in the performance of my duty to protect such war material, war premises, and war utilities, I am subject to military law during the period of my employment.
....................................."

(Signature of Plant Guard)

At the time respondent entered into its relationship with the federal government for the manufacture of armor plate (the record does not disclose the exact date but it was sometime in 1941), representatives from the Cincinnati Ordnance Office of the United States Army made a survey of respondent's plant facilities and prescribed the requirements of the government relative to protection. As soon as contracts for the production of war goods were entered into between the Army and respondent, a clause was inserted, stating, "Unless proper protection of government property is provided, in compliance with certain directives, the contract will be cancelled." It was in compliance with this requirement that respondent entered into a relation with those whom the Board has found to be its employes. A staff of sixty-four plant guards was installed, of which thirty-two were stationed at the Main Plant and thirty-two at the Fall Creek Ordnance Plant. As heretofore stated, respondent had theretofore employed only four watchmen, and with the exception of these four, none of the sixty-four persons installed as plant guards had previously been engaged in the service of respondent.

In Cincinnati, the War Department maintained a Continuous Security District Office, headed by A. C. Rasmussen, Lieutenant Colonel, Ordnance Department, as District Chief, and B. R. Wetenhall, Captain, Corps of Military Police, District Plant Guard Officer. There was no local resident Commanding Officer for the two plants of respondent, but such plants were included in a "group of plants" for which Lieutenant Scanlon of the Corps of Military Police was the Plant Guard Officer. Headquarters were maintained by him in Indianapolis for the training and discipline of plant guards of respondent, as well as those of other plants in a certain jurisdiction. At the Main Plant, the guards were in charge of Chief Johnston, and at the Ordnance Plant in charge of Chief Hann. Under each of these Chiefs were four guards designated as Lieutenants. Of these two Chiefs and eight Lieutenants, none were Army men.

In addition to Executive Order 8972 and the War Department's proclamation of July 2, 1942, heretofore quoted, there were issued by the War Department or some representative thereof a number of documents relative to the duties, obligations and rights of the members of the plant guard force. These documents in some respects also attempted to fix the obligations and rights of respondent. Included in such documents is a War Department directive of March 17, 1943, referred to as Circular No. 15,[1] and "Plant Protection Data Binder" dated June 7, 1943, issued by the Continuous Security District Office of the War Department at Cincinnati. Other material documents include guard orders Nos. 1, 2 and 3, issued by the Cincinnati Office on May 10, 11 and 12, 1943, respectively.

Four witnesses were heard by the Board, namely, Gann and Richardson presented by the Union in the representation proceeding, and Johnston and Wood who testified in behalf of respondent. Johnston was Chief of the plant guard force, and Wood was respondent's personnel manager. In fact, the entire proof as to the relation which actually existed between the plant guard employes and respondent was furnished by these witnesses.

We shall now examine the Board's findings, upon which its order is predicated. It first quotes the first paragraph of the agreement (heretofore quoted in full), in which the guard recites: " * * * I, ......, who have been or am about to be employed by ...... as a guard at ...... * * *." There is nothing, however, in the Board's decision or findings as to what,

[1] Circular No. 15 has been printed by the Board as a supplement to its brief. It was not introduced in evidence, and respondent contends that it cannot be considered as proof in support of the Board's order. It is a public document of which, so we think, a court may take judicial notice. Standard Oil Co. v. Johnson, 316 U.S. 481, 483, 62 S.Ct. 1168, 86 L.Ed. 1611.

if any, importance it attaches to the statement just quoted. Moreover, it would appear that this self-assertion would not constitute proof against respondent when contained in an agreement to which it was not a party. It is also pertinent to note that this form of agreement was furnished by the government and that an applicant could not obtain a guard position until it was signed. The "Plant Protection Data Binder," issued June 7, 1943 by the Cincinnati office, provided: "If a guard refuses to sign the agreement he may (but need not) be temporarily retained with the understanding that he will be dismissed as soon as he is replaced, and in any event within a reasonable time." It is significant, and this the Board omitted to mention in its decision, that the plant guard in this agreement pledged his allegiance to the government and stated: "I will well and faithfully discharge my duty as a civilian auxiliary to the military police to protect war material, war premises, and war utilities * * * and will obey any orders issued in connection therewith by the President, as Commander-in-Chief * * * and by his duly authorized officers." It is further significant that in this agreement no mention is made of any allegiance owed to respondent, or any obligation to take orders therefrom.

The material findings upon which the Board's order must rest are:

"The record shows that the guards are interviewed for employment by the respondent and not by the United States of America, and are hired by the respondent; that their discharge is ordinarily initiated by the respondent; and that during their employment they are paid by the respondent, at rates set by the respondent and not by the United States of America. According to Chief Guard Henry A. Johnston, a witness called by the respondent in the hearing in the representation case, he is in command of all the guards at one of the plants and works 'very closely' and 'cooperates' with the respondent's representatives. Moreover, Johnston admitted that the respondent could temporarily suspend a guard from duty. Cyrus E. Wood, the respondent's personnel director, who corroborated Johnston's testimony as related above, referred to the guards at the plants involved as the respondent's employees, and further testified that the respondent makes the 'necessary pay roll deductions' before paying them their wages.

"* * * It is true that for reasons of national security the respondent may have surrendered to the military authorities many of the attributes of control which it would normally possess over its plant guards. It is clear, however, that the respondent still retains a sufficient residual measure of control over the terms and conditions of employment of the guards so that the guards should not be deprived of the rights guaranteed in the Act."

It is important in this connection to note the test which the Board utilized as a basis for its finding of the existence of the employer-employe relationship. The test includes four incidents: (1) The guards were paid by respondent; (2) they were hired by respondent; (3) they could be discharged by respondent; and (4) the control exercised by respondent.

The incident most strongly emphasized is that they were paid by respondent. Undoubtedly, this is the most important incident common to the employer-employe relationship. In the instant case, however, it is, when viewed in connection with the attending circumstances, largely minimized if not entirely obliterated. Payment of these guards by respondent, in fact their employment, was a requirement imposed by the government as a prerequisite to respondent's right to engage in the manufacture of war material. It had no option to pay or not pay; neither did it have any option to employ or not employ. Chief Johnston, when asked why the guards were paid by respondent when their orders were received from the military authorities, stated an incontrovertible fact: "They pay because the government makes them pay." It must be assumed, so we think, that respondent was reimbursed by the government for all costs incurred in the manufacture of war material, including that of compensation paid to the guards. In reality, under such circumstances, as' bearing upon the employer-employe relationship, we are of the view that it makes no difference whether they were paid by respondent or by the government.

It is also well to keep in mind that this guard force was born of the exigencies of war. None of them (with the exception of the four original watchmen) had theretofore been employed at respondent's plant. They were employed at the command of the government and the purpose of their employment was, as stated in the President's proclamation, "to protect from injury

or destruction national-defense material, national-defense premises, and national-defense utilities," or, as stated in the agreement which the plant guard was required to sign with the government, "to protect war material, war premises, and war utilities against all enemies, foreign and domestic." In "Plant Protection Data Binder" dated June 7, 1943, the mission of a guard force is stated to be twofold: (a) "to provide interior and exterior protection of the plant against sabotage and espionage and natural hazards," and (b) "to serve with the Army in providing the protection to the plant and its environs in emergency situations." Again, it is stated in this Binder, "The auxiliary military police are supplementing the Army of the United States in a vital task of protecting war material and war production facilities." It appears certain not only that they were employed at the command of the government but that the services rendered by them were for the benefit of the government and the war effort. Any benefit accruing to respondent from their services was purely incidental to the primary purpose of their employment. Reliance upon payment under such circumstances is to embrace form and to ignore the realities of the situation.

■ The Board's finding that the guards "are hired by the respondent; that their discharge is ordinarily initiated by the respondent" is deceptive and, we think, without substantial support. It is true, as the Board found, that the guards "are interviewed for employment by the respondent." This is done by respondent's personnel officer when the applicant is required to fill out an application blank. This service on the part of respondent is also required by the government. At the time the application for employment is made, the applicant is expressly told: "It will not be effective without the approval of the United States government." True, after the application form had been executed, it was the custom temporarily to assign the applicant to plant control work. In the meantime, he was required by the government to sign the agreement with it, as heretofore related. This agreement stated: "The United States is approving the employment * * *." Also, as heretofore suggested, if he refused to sign this agreement, he never became a member of the military police and his dismissal was required within a reasonable time.

The application and agreement were then transmitted to the military authorities at Cincinnati and such authorities made an investigation as to the capacity, integrity and patriotism of the applicant. Such authorities had the entire responsibility of determining the applicant's fitness, even to the extent of his physical fitness. If he was accepted by the military authorities, the signed agreement with the government was returned to the applicant, together with a plant guard identification card executed by Captain Wetenhall, District Plant Guard Officer.

This card certifies: "...... has been voluntarily and duly enrolled as an Auxiliary to the Military Police for service with the Army of the United States at ...... and is subject to Military Law for the duration of the War or until the earlier official termination by the War Department of his services as an Auxiliary to the Military Police." It is pertinent to note that this identification card which constitutes the guard's authority states in no uncertain terms that he has been enrolled "for service with the Army of the United States at ......," and, further, that he is subject "to Military Law for the duration of the War or until the earlier official termination by the War Department." Certainly this badge of authority contains not the slightest indication that the guard has been employed, hired or can be discharged by respondent.

The applicant is also furnished with the "Certificate of Enrollment," also signed by Captain Wetenhall. The phraseology of this certificate is the same as that of the identification card. There appears in the record one of these certificates in its executed form.[2]

Upon receiving the documents just referred to, the applicant is inducted by taking the oath of allegiance to the United States and the military. This oath includes an obligation to be subject to the Articles

2 United States of America
Auxiliary Military Police
* Army of the United States
Certificate of Enrollment.
This is to certify that Henry Adams Johnston has been voluntarily and duly enrolled as an Auxiliary to the Military Police with the rank of ......, for service with the Army of the United States at E. C. Atkins & Company, Indianapolis, Indiana, and is subject to Military Law for the duration of the War or until the earlier

of War. Any doubt as to when employment as a member of the military police commences is dispelled by a provision in guard order No. 3, which states: "Service will begin with the date that the plant guard was inducted * * *."

Plant Protection Data Binder dated June 7, 1943 provides: "Each plant guard who becomes a member of the Auxiliary Military Police continues as such until he is released by the War Department from his obligations. This will take place when competent military authority has approved of his dismissal or resignation or when he has been discharged without honor."

Again, it is provided in this same Binder: "Basically the militarization of the plant guard forces does not change the existing systems of hiring, compensation, and dismissal except as stated in paragraph 25."

Paragraph 25 provides: "A member of the Auxiliary Military Police may not be employed, dismissed, or may not resign if the plant guard officer or other responsible Army representative believes that the efficiency of the plant guard force would be impaired and declines to give his approval thereto. Inasmuch as the guards are under oath to the Army, the plant management may suspend a guard without pay pending approval of his dismissal by the District Plant Guard Officer and pending the termination of the guard's enrollment as a member of the Auxiliary Military Police."

From what we have shown, we think it is conclusively established that the authority to hire and discharge was solely the prerogative of the military. True, respondent was charged by the government with receiving the application for employment and in making a recommendation. This is the sole support, if it can be characterized as such, found in this record for the Board's finding that respondent was authorized to hire. Nor do we find any support for the Board's finding that "their discharge is ordinarily initiated by the respondent." The most which can be inferred is that respondent was permitted to recommend for discharge the same as it was required to recommend for hiring.

In making this analysis of respondent's right to hire and discharge, we must note the testimony of the witness Gann, which the Board stresses. It follows:

"Q. Who hires the guard? A. The personnel manager and the Chief.

"Q. Who has the authority to discharge you? A. The personnel manager or the Chief, I would think, of E. C. Atkins and Co."

These answers by the witness merely represented his opinion and, in addition, the "Chief" referred to was Chief Johnston who, as will be shown, was entirely under the control of the military. Putting aside, however, such considerations, a reading of Gann's entire testimony shows conclusively that he was employed in the same manner as all other guards. This is illustrated by the following questions and answers:

"Q. From the 21st of January to the 27th of January you were an employee of E. C. Atkins and Company? A. Yes, sir.

"Q. They pay you whether you are their employee or whether you are a military policeman, but from January 27 you became a military policeman and were no longer an employee of E. C. Atkins and Company, as you had been up to January 27? Your status changed, did it not? A. That's right. I wasn't a member of the Auxiliary Military Police until I was inducted January 27."

The most favorable possible inference which can be drawn from the record is that respondent's authority, if it had any, with reference to hire and discharge was narrowly limited; in fact, as we have stated, we think it had no right in such matters except that of making recommendations to the military authorities.

█ This brings us to the matter of control. The Board's finding in this respect may be properly characterized as wholly impotent. It admitted that "respondent may have surrendered to the military authorities many of the attributes of control which it would normally possess over its plant guards." It found, however, that it retained "a sufficient residual measure of control." What was intended by this language is not explained. The findings are silent as to any act or conduct on the part of respondent which evidences any

official termination by the War Department of his services as an Auxiliary to the Military Police. For the Commanding General, Fifth Service Command:

█

Dated 29 June 1943.
Official:
B. R. Wetenhall,      A. C. Rasmussen
Plant Guard Officer.

control. The oral testimony shows without any contradiction that all members of the plant guard at the Main Plant took their orders and instructions from Chief Johnston. (We assume that the members of the force at the Ordnance Plant likewise took their instructions from Chief Hann; at any rate, no question is raised but that the same situation existed at each plant.) The record shows with the same degree of certainty that Johnston took his instructions in toto from the military authorities. The only reference made by the Board in this respect was that Johnston "works very closely and cooperates with respondent's representatives." We should think that the exercise of ordinary common sense would require cooperation between the military and the management, but that fact certainly can form no basis for an inference that respondent exercised control. Especially is this so when the direct uncontradicted evidence is that all control was exercised by the Army. In this connection, it seems appropriate to relate certain portions of Johnston's testimony, and we do so in a footnote.[3]

The witness Gann, who testified that he was acquainted with all the duties of a guard, did not mention a single instance in which any duty was performed under the direction of respondent. On the other hand, he conceded that all duties were performed under orders received from the military. True, at one place in his testimony

he was asked, "What, in general, do guards do?" and answered, "In general they guard the plant, supposed to obey all the general orders and specific orders which the company asks us to obey." Later he testified, in complete harmony with the other witnesses, that by general orders he meant those issued by the government pertaining to the service generally, and by special orders he meant those issued by the government which applied especially to respondent's plant. Then he was asked, "And when you said 'company orders' you did not mean the E. C. Atkins Company, but the military company to which you belong? They are the lieutenants, the assistant chief, the chief, and then Lt. Scanlon and Capt. Wetenhall?" And he answered, "Well, that's true."

That the military had control even to the minutest detail is shown by the testimony of Gann that special orders were received from the military as to the particular gate through which certain trucks should enter the plant. Also illustrative of this absolute control is the testimony of Johnston. In response to a question as to what he would do if he found Mr. Wood tampering with machinery or personnel, he answered:

"Well, in a case like that, I would just turn him in, like anybody else. I would arrest him and turn him in because I am sworn to do that. I have sworn an oath.

"Q. Would you do the same with the

---

3 "Q. Do you take any orders from Mr. Wood who sits here in the court room and is the personnel director of E. C. Atkins and Company? A. Yes, naturally, I work very closely with Mr. Wood, as he is personnel director of the plant and there can be much more efficient guarding of the plant and operation of the plant if we do work closely. I have never taken an order as such from him.

"Q. You try to cooperate? A. I try to cooperate to the best of my ability and he does the same for me."

\*     \*     \*     \*     \*     \*

"Q. Now, how do you receive the general orders for your duties, from what source? A. General orders are received from Captain Wetenhall of the Fifth Service Command, Cincinnati."

\*     \*     \*     \*     \*     \*

"Q. (Referring to violation of military orders) To whom do you report such violations? \* \* \* A. I would report any violation, any serious violation, to Captain Wetenhall of Cincinnati.

"Q. And who instructs you to enforce orders? A. It would be the government."

\*     \*     \*     \*     \*     \*

"Q. Do any of the Military Police under your command take any orders from any officer, director, or agent of the Atkins company as such? A. No, they wouldn't take any orders. Just like myself, they would cooperate in any way they could, but they would only—

"Q. Suppose such cooperation involved deviation from such specific order which you had to give. Would they follow your specific order or would they cooperate? A. They would—that would be their orders—to follow mine, yes, sir.

"Q. You would have the same reaction towards such request of cooperation as you would if you had a specific order or a general order to the contrary from one of these superiors, is that right? A. Yes, sir. In those orders, it says, 'No conflicting interest.' It means a little different thing there but it means a lot besides. You would follow your Governmental orders first. They would have a much higher priority."

president of the company? A. Yes, sir, I would.

"Q. And you own no responsibility to the president or any director of the company which would make you violate your oath to the Military? A. No, sir, there is no reason for that."

Johnston also identified three forms of passes which were issued to various employes, one for admission from the outside into the armor plate division, another for admission into the same division by an employe entering from another department, and another known as a gate pass, which permitted the entering and departure from a gate. No employe could enter a gate or a building until he had exhibited to a member of the guard the appropriate pass. Even an executive of the company could not enter a gate or go from one building to another without exhibiting his pass to a guard. These were military orders.

The statement in the Board's findings that respondent's personnel director "referred to the guards at the plants involved as respondent's employees" is also without substance. It is based solely upon the following questions and answers:

"Q. How many of your employees at the main plant are plant guards or Auxiliary Military Police? A. Thirty-two.

"Q. When you say your employees, they are your employees only in the sense that you pay their wages, is that right? A. That is correct.

"Q. And you make the necessary pay roll deductions? A. That's right."

We think the conclusion is inescapable that the Board's findings based upon proof as to what actually happened is without substantial support. The proof shows without contradiction that respondent (1) paid the guards, but under the circumstances heretofore related, (2) had nothing to do with hiring and discharging other than making recommendations as to the former, and (3) exercised no control. True, the Board intimates that respondent failed to exercise the authority which it had, and stresses certain provisions in the documentary evidence which perhaps lend some color to the suggestion. We are of the view, however, that the employer-employe relationship must be determined from the actual situation as disclosed by the proof rather than from what the situation might have been. In this connection, we observe that the Board has called to our attention a number of its own decisions wherein it has decided that plant guards are employes. Some of these cases we have studied, and we think the facts, especially as disclosed by the oral testimony on the matter of control exercised by the company, are quite different from those shown here. We are further of the view that this case must be decided on the facts contained in the record before us and not on the Board's decisions in other cases on different facts.

While we have heretofore made numerous references to the documentary proof, we think that it is entitled to further consideration. It is plain from the record that both respondent and the guard members formulated their activities largely upon the instructions contained in guard orders 1, 2 and 3. It is doubtful, at any rate there is nothing in the record to disclose, that they were even aware of some of the documents which the Board now relies upon and especially circular No. 15, issued by the War Department March 17, 1943. (This circular, as heretofore noted, was not introduced in evidence.) The guard orders were posted in various places at the two plants and were the orders under which the guards actually worked. The importance attached to these orders is shown from the fact that they were blown up in photostatic replicas, "enlarged four times," that the plant guards could familiarize themselves with their provisions.

Guard order No. 1 had underlined for particular emphasis the following sentence: "No conflicting interest of any kind will be permitted to interfere with the successful accomplishment of this mission." There is not a word in such order which intimates other than that the guard members are entirely under the jurisdiction and authority of the military. They are told that they are subject to the Articles of War and court martial, that a commissioned officer of the United States Army has been placed in command, that the mission of the guard force is to provide protection for the plant, that a member is available for military use whether on or off duty, that protection of the plant and its production is essential to the successful prosecution of the war, that service begins with the date he is inducted into the military police, and that no member may resign without the written approval of the District Plant Guard Officer.

Guard order No. 2 states eighteen general orders which the member is required

to be prepared to recite when directed by his superior officers. A comparison of these guard orders with the Basic Field Manual or Soldiers' Handbook, edition of July 23, 1941, issued by the War Department, shows that the duties, responsibility and discipline of a plant guard member is as strict as that imposed in any branch of the military service.

Guard order No. 3 authorizes the wearing of service stripes in accordance with Army regulations for services faithfully performed, and provides that "service will begin with the date that the plant guard was inducted into the Auxiliary Military Police."

The Board places strong reliance upon certain provisions contained in circular No. 15 of the War Department, dated March 17, 1943. This document occupies twenty full pages of the Board's brief. A cursory reading of certain statements contained in this document seems to indicate that respondent had some measure of authority over members of the plant guard. Even if this be so, however, as we have heretofore shown, all authority and control was taken over by the Army and none was exercised by respondent. Furthermore, we are of the view that this document when considered as a whole, and especially when considered in connection with other documents to which we have referred, leaves little room for the contention that respondent had the right but failed to exercise control.

We shall refer to a few of the more striking statements relied upon by the Board. The document states: "Nothing in this circular will be construed as modifying the responsibility of plant management 'for providing adequate protection at all times against all hazards.'" Certainly this statement constitutes no proof that respondent actually exercised any control of the plant guards or even that it had any right to exercise such control. Moreover, immediately following the statement just quoted, the plant guard officer is authorized to take appropriate action to correct any defective or inadequate performance "by the guard force of its ordinary protective duties." The document states: "The mission of this guard force is to provide protection for this plant. In addition to its normal functions the force or any member thereof whether on or off duty is available for military use in any emergency * * *. No conflicting interest of any kind will be

permitted to interfere with the successful accomplishment of this mission." We are unable to discern any assistance in this statement for the Board's theory. It appears certain that the protection for the plant referred to is that which the government requires in behalf of the war effort. The statement recognizes that whether services rendered be normal or of an emergency character, they are rendered as members of the force. Another statement relied upon: "The Auxiliary Military Police will continue to function as formerly * * *. Control, therefore, will be exercised as heretofore through the plant management." This statement is also meaningless, in view of the fact that no plant guard system had theretofore been in existence at respondent's plant. Furthermore, as already shown, actual control of the guard force was taken over by the military.

Another provision emphasized by the Board is: "Basically, the militarization of plant guard forces does not change the existing systems of hiring, compensation, and dismissal; all remain primarily a matter between the guards and the plant managements." The interpretation which the Board places upon this statement is immediately dispelled by the sentence which follows: "A member of the Auxiliary Military Police may not be employed or dismissed and may not resign if the plant guard officer or other responsible Army representative believes that the efficiency of the plant's guard force would be impaired and declines to give his approval thereto." How it can be said that respondent had the right to hire and dismiss when that prerogative was placed squarely in the Army is a theory we are unable to follow. In this connection, it is pertinent to note that this document also provides: "The Auxiliary Military Police, as agents of the Federal Government, will not be subject to any state or municipal requirement which conflicts with their war-time duties."

We now refer to certain provisions of circular No. 15 which really constitute the backbone of the Board's argument that members of the plant guard are employes of respondent and entitled to collective bargaining. It is provided: "The status of the employer in respect to the employee benefits for the guard force is not changed. For example, social security, workmen's compensation, and employers' liability provisions remain unaffected." Also: "Aux-

iliary Military Police are permitted to bargain collectively, but no such activity will be tolerated which will interfere with their obligations as members of the Auxiliary Military Police. * * * If any proposed labor agreement is being considered which involves plant protection employees who are or may become members of the Auxiliary Military Police, the contracting parties will be urged to insert in such agreement a provision substantially as follows: 'It is understood that for the duration of the war this agreement is in all respects subject to the provisions of the directives of the War Department concerning military organization of the plant guard forces * * * and that nothing contained in this agreement will be construed in any way to interfere with the organization, efficiency, training, and control by the War Department of the company guard force as an Auxiliary to the Military Police, nor to abrogate or interfere with the duties, responsibilities, and rights imposed by the War Department upon any employee in such Auxiliary Military Police'."

█ We suppose that these provisions represent an effort on the part of the War Department to preserve, in the instant situation to create, the status of employer-employe relationship between members of the plant guard and respondent. It attempted to counteract the emasculating effect which its orders and directives had had upon the ordinary incidents attending such relationship. In our judgment, these provisions weaken rather than strengthen the position of the Board. The War Department, acting under the authority of the President's proclamation, created this guard force. In doing so, it stripped the respondent and denuded members of the force of all the attributes common to the employer-employe relationship. Having created this situation, we think it was without authority to revitalize that which it had destroyed.

These provisions may indicate a willingness or even a desire on the part of the War Department that plant guards retain their status as employes, but even so, such desire cannot determine or alter the legal rights of the parties. Furthermore, the right to bargain is limited, if not destroyed, by the condition "but no such activity will be tolerated which will interfere with their obligations as members of the Auxiliary Military Police." This gratuity on the part of the War Department is on a par with that extended to a boy when he is given permission to swim, providing he stays away from the water. The requirement that "for the duration of the war" any agreement between plant guards and the plant must be subject to the directives of the War Department and will not interfere in any way with the duties and responsibilities imposed by the War Department is, in effect, the postponement of the right to bargain, as contemplated by the Act, until some future time.

█ The Board found, apparently in response to a contention made by respondent, that the plant guards are not employes of the United States of America. From this it argues that because they are not employes of the government they must be those of respondent. We are not impressed with this argument. Neither do we think it is necessary for us to determine the technical status which they occupy with the federal government. That they sustain a relationship closely akin to that of a soldier cannot be doubted. The certificate of enrollment issued by the War Department provides that the applicant "has been voluntarily and duly enrolled as an Auxiliary to the Military Police with the rank of ...... for service with the Army of the United States at E. C. Atkins and Company." Thus they are enrolled "for service with the Army." Moreover, the War Department itself in circular No. 15, as already noted, designates them as "agents of the federal government." Irrespective, however, of their technical classification, there can be no doubt but that they are representatives of the federal government for the duration of the war and engaged in a service necessary for its successful prosecution. In our view, the relation which they sustain to the federal government is wholly incompatible with the theory that they are employes of respondent within the meaning and purpose of the National Labor Relations Act. We hold accordingly.

The further question, closely related to the one we have just decided, is whether the Board's order requiring respondent to bargain with the Union should be enforced. In considering this question, we assume, contrary to our holding, that members of the military guard are employes of respondent.

█ The purposes and policy of the National Labor Relations Act are well known and need not here be dwelt upon. The

Board must comply with the requirement "that the unit selected must be one to effectuate the policy of the Act, the policy of efficient collective bargaining." The capacity in which the Board acts is succinctly stated in National Licorice Co. v. N. L. R. B., 309 U.S. 350, 362, 60 S.Ct. 569, 576, 84 L.Ed. 799: "The Board acts in a public capacity to give effect to the declared public policy of the Act to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining and by protecting the 'exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment * * *.'" See also Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 265, 60 S.Ct. 561, 84 L.Ed. 738.

■ There is no room for argument but that any field open for bargaining between the Union and respondent is an extremely limited one. This must have been fully recognized by the War Department when it included in circular No. 15 heretofore discussed the admonition that "no such activity will be tolerated which will interfere with their obligations as members of the Auxiliary Military Police." As already pointed out, the Act contemplates "full freedom" on the part of the employes, with the right of "efficient collective bargaining." It is difficult to understand, in view of the policy stated, how the right to bargain, not fully and efficiently but only in some limited fashion, can be contemplated by the Act.

A more cogent reason, however, why enforcement should not be allowed is that to do so would be or is likely to be inimical to the public welfare. The Board in its order entirely ignores the unusual status occupied by members of the plant guard by reason of their enrollment for service with the military. As heretofore shown, they are largely if not entirely under the control and direction of the War Department. They wear the uniform of a soldier, owe the same allegiance, receive their authority and commands from the same source, are enlisted for the duration of the war for service with the Army, and are engaged in the performance of a service essential to the successful prosecution of the war. Pertinent is the statement in Southern Steamship Co. v. N. L. R. B., 316 U.S. 31, 47, 62 S.Ct. 886, 894, 86 L.Ed. 1246: "It is sufficient for this case to observe that the Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives."

In the recent cases of N. L. R. B. v. Jones & Laughlin Steel Corporation [N. L. R. B. v. Federal Motor Truck Co.], 6 Cir., 146 F.2d 718, 722, the court in denying enforcement orders under a situation similar to that of the instant case said: "The national welfare is of supreme importance and especially is this true in time of war. The evidence reflects the deep concern of the Government for the maintenance and protection of respondents' plants and for the integrity and volume of their products. * * * It must be kept in mind that in time of national peril, the preservation, protection and promotion of the national welfare is the paramount objective; and the Board must select bargaining agents with this in view."

We agree with the statement just quoted. Nothing should be permitted which will interfere in any degree or to any extent with the obligation which these guards have with the military. Membership in a union with the right to bargain might, in fact is likely to, do that very thing. To so state is not to cast any reflection upon the patriotism of the guard members. It is merely a recognition of that which is a matter of common knowledge.

In concluding, it is pertinent to observe that the enforcement of this order would be little more than an idle gesture. It is difficult to see how it could be of any practical benefit, and it might do immeasurable harm to the war effort and consequently to the public interest. The petition for enforcement is denied.

KERNER, Circuit Judge, concurs in the result.