**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Rene Martin VERDUGO–URQUIDEZ,**
**Defendant–Appellant.**

**No. 88–5462.***

United States Court of Appeals,
Ninth Circuit.

Argued Feb. 4, 1991.

Submitted June 13, 1991.

Decided July 22, 1991.

---

* On July 31, 1990, we issued an order consolidating this appeal with the appeal of one of Verdugo–Urquidez' co-defendants, Jesus Felix–Gutierrez, No. 89–50028. We dispose of Felix–Gutierrez' appeal in a separate opinion issued concurrently herewith.

Patrick Q. Hall, Goldberg, Frant & Hall, San Diego, Cal., for defendant-appellant.

Robert L. Brosio, Asst. U.S. Atty., Chief, Crim. Div., William F. Fahey, Asst. U.S. Atty., Chief, Major Narcotics Section, Steven E. Zipperstein, Asst. U.S. Atty., Chief, Crim. Appeals, Dorothy Shubin, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

William P. Barr, Deputy Atty. Gen., Andrew G. McBride, Associate Deputy Atty. Gen., John E. Barry, Sr. Counsel, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before BROWNING, D.W. NELSON and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

This case presents the question whether the United States breaches its obligations

under its extradition treaty with Mexico if it authorizes or sponsors the forcible taking of a Mexican national from that country without the consent of the Mexican government. We hold that it does. We further hold that if the Mexican government formally objects to the treaty breach and a defendant timely raises that breach in a pending criminal proceeding the courts of the United States may not exercise personal jurisdiction over that defendant, provided the Mexican government is willing to accept repatriation. In short, under such circumstances a district court may not subject the defendant to trial, and a conviction obtained must be vacated. In view of our holdings, we remand Verdugo–Urquidez's case to the district court for an evidentiary hearing on the question whether the United States authorized or sponsored his kidnapping and unlawful removal from Mexico to this country without the consent of the Mexican government and on such other matters as may be relevant to the proceeding.

## BACKGROUND

Rene Martin Verdugo–Urquidez ("Verdugo") is a citizen and resident of Mexico. In January 1986, he was apprehended in Mexico by several individuals and transported to the United States, where he was officially taken into custody. On March 16, 1988, a federal grand jury returned a five-count second superseding indictment against Verdugo charging him with various offences, including the murder of United States Drug Enforcement Agency ("DEA") Special Agent Enrique Camarena–Salazar. Verdugo then filed a motion to dismiss the indictment pursuant to the extradition treaty between the United States and Mexico. He alleged that the individuals who apprehended him in Mexico were acting at the behest of the United States government.

In support of his motion, Verdugo attached copies of two letters from the Mexican Embassy to the United States Department of State. In these letters, Mexico lodged what it termed "a formal complaint regarding the kidnapping of" Verdugo by agents of the United States government and asked that the "U.S. judicial authorities" be informed of its position. Verdugo also presented two letters that the Department of State sent to the Mexican Embassy in response to the latter's protest. The Mexican Embassy and the Department of State differed in the characterization of Verdugo's "kidnappers." The Mexican Embassy letter of August 26, 1987, stated that Mexican police officers were surreptitiously hired by the DEA to kidnap Verdugo. By contrast, the State Department—although acknowledging that the Mexican police officers acted in "cooperation" with the United States authorities—claimed that the payment of the Mexican police officers by the DEA was not prearranged.

Despite the dispute over whether Verdugo had been kidnapped by the United States or voluntarily handed over to the United States by Mexican police, the district court did not hold an evidentiary hearing. The court determined that such a hearing was unnecessary because, in its view, even if Verdugo's allegations were correct, they would not warrant dismissal. Citing *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1888), and *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), the court stated that "an abduction does not violate an extradition treaty." [1]

Following a two-month jury trial, Verdugo was convicted of all the charges against him. The district court sentenced him to four consecutive 60–year terms of incarceration (for a total of 240 years), those terms

---

1. Subsequently, in a case presenting the identical issue and arising out of the same underlying criminal occurrences, the same district judge, Judge Rafeedie, conducted further legal research on his own, and reached the opposite conclusion. After observing that counsel had been of little assistance to him in resolving the difficult issues involving the law of extradition, he proceeded to write an exhaustive and schol-
arly opinion on the subject. *See United States v. Caro–Quintero,* 745 F.Supp. 599 (C.D.Cal.1990). In *Caro–Quintero,* Judge Rafeedie concluded that Dr. Alvarez–Machain must be returned to Mexico because his abduction, authorized by the DEA, violated the treaty at issue here. For purposes of clarity, we exclude the decision in *Caro–Quintero* when we refer to relevant *prior* decisions in this area of the law.

to run concurrently with a life sentence. Verdugo filed a timely notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

■ Although Verdugo raises 21 separate issues on appeal, in view of the conclusion we reach below, we need only consider his challenge to the district court's jurisdiction. "If a court lacks jurisdiction over a party, then it lacks 'all jurisdiction' to adjudicate the party's rights, whether or not the subject matter is properly before it." *Rankin v. Howard*, 633 F.2d 844, 848 (9th Cir.1980), *cert. denied*, 451 U.S. 939, 101 S.Ct. 2020, 68 L.Ed.2d 326 (1981).

## STANDARD OF REVIEW

■ Interpretation of a treaty presents a legal question, which we decide *de novo. Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir.1986). Whether the district court had jurisdiction if the treaty was violated is also subject to *de novo* review. *United States v. Layton*, 855 F.2d 1388, 1394 (9th Cir.1988), *cert. denied*, 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989).

## DISCUSSION

### I

This case presents fundamental issues of first impression that involve the purpose and effect of extradition treaties, the ordering of relations between treaty signatories, the proper rules for interpreting such treaties, the role of the judiciary in enforcing them, and, ultimately, the right of a defendant to object to the court's jurisdiction if he has been abducted in violation of a treaty and a party to the agreement formally protests that violation. No prior reported case has decided the ultimate question we

are required to answer here. To perform our task properly, we not only must review the prior case law, but must also examine the reasons nations enter into extradition treaties and their expectations as to the consequences such agreements will have. We must also, of course, consider the specific treaty of extradition that governs the relations between the United States and Mexico.

### II

On January 25, 1980, the United States and Mexico exchanged official ratification notices of the Extradition Treaty Between the United States of America and the United Mexican States ("the Treaty"). 31 U.S.T. 5059, T.I.A.S. No. 9656. The Treaty was in effect at the time Verdugo alleges that he was forcibly abducted from Mexico by the United States, and remains in effect to this day. *See* U.S. Const. art. VI, cl. 2 (treaties are "Supreme Law of the Land"). Verdugo contends that his abduction violated the Treaty, and that as a result of this violation, the district court was without jurisdiction to try him. The government counters that: (1) if the United States forcibly abducts an individual from another nation there is ordinarily no bar to personal jurisdiction in a criminal trial even when there is an extradition treaty between the United States and that other nation, and even when the other nation formally protests "the treaty violation"; (2) the Treaty's silence as to whether extradition is the exclusive means for bringing a Mexican national to trial in the United States necessitates the conclusion that the treaty does not prohibit kidnapping; and (3) whether there has been a treaty violation is, in any event, not an issue that a defendant may properly present to the judiciary.[2] These

2. The government also contends that Verdugo did not properly raise the issue in the court below or in this court. We disagree. The record reflects that Verdugo did indeed raise the issue below. Moreover, our general rule that we do not consider issues raised for the first time on appeal, *see, e.g., Winebrenner v. United States*, 924 F.2d 851, 856 n. 7 (9th Cir.1991), is itself based on the fundamental notion that " 'a federal appellate court does not consider an issue *not passed upon* below.' " *United States v.*

*Patrin*, 575 F.2d 708, 712 (9th Cir.1978) (quoting *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)) (emphasis added). Here, whether or not Verdugo raised the personal jurisdiction issue below in precisely the same manner that he has framed it on appeal, the district court decided the very issue we now face. Thus, there is no doubt that we may consider the issue on appeal, unless Verdugo

arguments are not neatly compartmentalized and tend to overlap in a number of respects. Accordingly, we address the government's contentions as and when they appear to be pertinent to the controlling issues in the case.

## III

### A

The government argues initially that this case falls under the so-called *Ker/Frisbie* rule. Named for the two Supreme Court decisions of *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), and *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), this "rule" states that "the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' " *Id.* at 522, 72 S.Ct. at 511. Although courts, commentators, and politicians alike have often taken this statement to imply that the means by which a defendant is brought before the court are *never* relevant to the jurisdictional question, *see generally* Kester, *Some Myths of United States Extradition Law*, 76 Geo.L.J. 1441, 1449–55 (1988), our review of the relevant cases indicates that this is a serious overstatement. In fact, there are numerous cases in which the method by which a defendant has been brought before the court has been held to defeat jurisdiction. *See infra* at 1351 (discussing the principle of specialty). No recorded case has ever addressed the question whether when the United States forcibly removes an individual from another nation in violation of an extradition treaty between the United States and that other nation, and when the other nation formally protests that violation, the defendant may successfully interpose an objection to the court's exercise of jurisdiction over his person. Whether a defendant may prevail on such an objection remains an open question.

### B

We now turn to the *Ker/Frisbie* line of cases. We begin with *Ker*. Ker was a United States citizen who was wanted for trial on larceny charges in Illinois. After he fled to Peru, a messenger was sent by the President to retrieve him from the Peruvian authorities in accordance with the extradition treaty between the United States and Peru. 119 U.S. at 438, 7 S.Ct. at 226. However, instead of presenting the extradition papers to the Peruvian authorities and accepting Ker, as he had been instructed to do, the messenger simply kidnapped him and placed him on a ship bound for the United States. *Id.* Ker objected that the manner of his abduction violated due process and the extradition treaty. The Supreme Court disagreed with both contentions.

As we have noted, it has sometimes been suggested that *Ker* stands for the very broad proposition that a court may exercise jurisdiction over a defendant who appears in that forum regardless of the circumstances under which he was brought there.[3] In our view, there are two principal reasons why *Ker* cannot be read this broadly.

---

somehow forfeited his right to a decision during the appellate process.

The government contends that Verdugo waived the issue on appeal by failing to raise it in his opening brief. We disagree for two reasons. First, we conclude that the issue was adequately raised in the opening brief. Second, we have held that an appellant may not raise an issue on appeal in a reply brief if he has failed to discuss it in his opening brief, *unless the appellee has raised it in his brief*. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir.1990). Here, the government clearly addressed the question whether the alleged kidnapping violated the extradition treaty in its brief. To ensure that each side had a fair opportunity to present its views, we instructed the parties to file supplemental briefs and supplemental reply briefs. Having been thoroughly briefed by both sides, the kidnapping issue is squarely before us.

3. For example, Senator Arlen Specter of Pennsylvania, a well-respected lawyer and an able former District Attorney, has argued that as a consequence of *Ker,* no extradition treaty prevents a court of the United States from trying terrorists who have been kidnapped by United States agents abroad. *See* Specter, *How to Make Terrorists Think Twice*, N.Y. Times, May 22, 1986, at A31, col. 1.

First, *Ker* was not a case of *authorized* kidnapping. The Court held that the extradition treaty was not implicated because Ker's abduction "was a clear case of kidnapping within the domains of Peru, *without any pretence of authority* under the treaty *or from the government of the United States.*" *Id.* (emphasis added). On this basis, the Court found no treaty violation. In short, since the messenger who wrongfully kidnapped Ker was not acting on behalf of the United States, the United States did not breach the treaty. Therefore, *Ker* stands only for the proposition that a private kidnapping does not violate an extradition treaty. It does not address the question of a kidnapping authorized by the United States government. *See* Kester, 76 Geo.L.J. at 1449–55.

This limited view of *Ker* was succinctly expressed by Chief Justice Taft, writing for the Court in *Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927). There, the defendants argued that they and their ship had been seized by the United States Coast Guard in violation of a treaty between the United States and Great Britain regarding interdiction of smugglers. Relying on *Ker*, the Solicitor General argued that "an illegal seizure would not have ousted the jurisdiction of the court to try the defendants." *Id.* at 605, 47 S.Ct. at 535. The Court expressly rejected this argument, noting that *Ker* did not involve a violation of "a treaty of the United States," while *Ford* directly involved that issue. *Id.* at 606, 47 S.Ct. at 535. The Court then stated unequivocally that the question whether the seizure violated the treaty "affected the right of the court to hold [the defendants'] persons for trial." *Id.* Although the Court did not address the question whether the treaty had been breached because it found that the issue had been waived in the trial court, it suggested that had the issue been properly preserved, and had a seizure outside of the treaty been shown, there might have been no personal

jurisdiction, notwithstanding *Ker*. *Id.* *Ford* illustrates that the expansive view of *Ker* has not been adopted by the Supreme Court.

In fact, in *Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933), Justice Brandeis raised serious questions as to whether the government may benefit from even a private party seizure when under a treaty "the Government itself lack[s] power to seize." *Id.* at 121, 53 S.Ct. at 312.[4] Despite Justice Brandeis' intimations to the contrary, we assume for purposes of this opinion that *Ker*—properly understood as standing for the limited proposition that a non-governmental kidnapping does not violate an extradition treaty even if the government ultimately benefits thereby—remains the law, and that the courts that have subsequently relied on *Ker* in their holdings did not err in doing so.

Second, even if *Ker* were relevant to a government authorized or sponsored kidnapping, it would still not be dispositive in this case, because in *Ker*, the Peruvian government did not object to the failure to utilize the extradition treaty.[5] Here, as we have noted, the Mexican government lodged a formal protest. As the government concedes, in no reported case has a court held that an officially authorized or sponsored kidnapping did not violate an extradition treaty when the country from which the defendant was kidnapped objected to the abduction. In fact, numerous cases have suggested that were the government of the country from which an individual was kidnapped to lodge a formal protest with the United States, that protest might defeat jurisdiction. *See infra*, n. 9

The reason why the question whether there is an official protest is critical is that extradition treaties are principally designed to further the sovereign interests of nations, and therefore any rights they confer on individuals are derivative of the rights of nations. Because there has been no

---

4. *Cook* only mentioned *Ker* in a "compare" citation regarding a common-law rule. 288 U.S. at 121, 53 S.Ct. at 312.

5. In fact, because the relevant events took place shortly after a revolution, apparently there was no functioning Peruvian government that could have registered a protest. *See* Kester, 76 Geo. L.J. at 1451.

prior case in which the other signatory to a treaty has protested an alleged kidnapping by the United States, we must consider, here, for the first time whether such an official protest clothes a defendant in the rights of the nation from which he was abducted.

## C

*Frisbie* involves a wholly different issue and provides no support for the broad reading of *Ker*. In *Frisbie*, a habeas petitioner asserted that the Michigan trial court which convicted him of murder lacked jurisdiction because Michigan authorities had kidnapped him from Illinois. He based his objection on the due process clause of the fourteenth amendment and the Federal Kidnapping Act. 342 U.S. at 520, 72 S.Ct. at 510. No extradition treaty was involved. Solely in the context of rejecting the due process claim, the Court stated that it had "never departed from the rule announced in *Ker* ... that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'" *Id.* at 522, 72 S.Ct. at 511. As we have noted, the basis for the decision in *Ker* was the Court's determination that there had been no official act of the United States which might violate the extradition treaty with Peru. Having decided that there was no treaty violation, the Court in *Ker* also declined to hold that due process posed a bar to jurisdiction. It is this second holding—that the due process clause does not prohibit the exercise of personal jurisdiction over a defendant who has been brought before the court by kid-

napping—that *Frisbie* reaffirmed. However, Verdugo's claim is grounded in the Treaty, not the due process clause. Thus, *Frisbie's* reaffirmance of *Ker's* statement about the due process clause is irrelevant to this case.

Moreover, the rule announced in *Frisbie* is suited to cases of *domestic* kidnapping, not *international* kidnapping. When an individual is abducted from another nation in violation of an extradition treaty, the remedy is apparent: he must be returned to the custody of the government lodging the protest. *See infra*, part VII. By contrast, if the Court had held in *Frisbie* that there was no jurisdiction (either on the basis of the due process clause or the Federal Kidnapping Act), it would have faced an intractable remedial problem. In the case of a foreign national, after he is repatriated, the United States could invoke the extradition process, and depending on the outcome of that process, *might* be able to obtain jurisdiction over him.[6] However, in the case of a United States citizen, there is little possibility that one state would attempt to harbor a fugitive from another. *See* 18 U.S.C. § 3182 (by 1948 Act of Congress, each state must deliver fugitives to requesting state). Had the Court ruled in favor of the petitioner in *Frisbie*, any remedy would have been an exercise in futility. Sending him back to Illinois would only have resulted in his subsequent surrender by Illinois to the Michigan authorities. This remedial difficulty may have motivated the decision in *Frisbie*, at least in part. It also makes clear the limited applicability of inter-state kidnapping cases to international kidnapping cases.[7]

---

**6.** For example, as we discuss more fully below, *infra* at 1350–1351, Article Nine of the United States/Mexico extradition treaty gives each nation the discretion to surrender or not to surrender its own nationals.

**7.** Equally irrelevant are those cases not involving extradition treaties which refuse to imply an "exclusionary" remedy of suppression of the defendant's person where he was arrested unlawfully. *See INS v. Lopez–Mendoza*, 468 U.S. 1032, 1039, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984); *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980); *Stone v. Powell*, 428 U.S. 465, 485, 96 S.Ct. 3037,

3048, 49 L.Ed.2d 1067 (1976); *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865–66, 43 L.Ed.2d 54 (1975); *United States v. Cotten*, 471 F.2d 744, 748 (9th Cir.), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973). As we explain in part IV, *infra*, extradition treaties set forth mandatory procedures that must be followed in order for a defendant who resides or has taken refuge in another country to be brought to *trial* in the United States. Therefore, failure to comply with an extradition treaty directly affects the jurisdiction of the court in a way that a typical illegal arrest—even if in violation of the Constitution—does not.

## D

There is one final reason why we reject the broad view of the *Ker/Frisbie* line of cases. It is manifestly untrue that a court may never inquire into how a criminal defendant came before it. *United States v. Rauscher,* 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), clearly illustrates this fact. *Rauscher* was decided the very same day as *Ker,* and both opinions were written by Justice Miller. In *Rauscher,* the Court held that under the extradition treaty of 1842 between the United States and Great Britain, a defendant could only be tried for a crime for which he had been extradited. The Court thus read into the treaty what has come to be known as a "principle of specialty."

Both the holding and the rationale of *Rauscher* utterly belie the broad reading of *Ker.* *Rauscher* held that a defendant who has come before the court by operation of an extradition treaty "shall be tried only for the offense with which he is charged in the extradition proceedings and for which he was delivered up, and that if not tried for that, or after trial and acquittal, he shall have a reasonable time to leave the country...." *Id.* at 424, 7 S.Ct. at 243. In short, under *Rauscher,* it matters very much how a defendant happened to come before the court. If he came before the court by the operation of an extradition treaty, he may not be tried for any crime but the one for which he was extradited. Indeed, in reaching the result that it did, the Court in *Rauscher* expressly rejected the proposition that a defendant,

> once being within the jurisdiction of [the United States], no matter by what contrivance or fraud or by what pretence of establishing a charge provided for by the extradition treaty he may have been brought within the jurisdiction, he is, when here, liable to be tried for any offence against the laws as though arrested here originally.

*Id.* at 422, 7 S.Ct. at 242. Thus, *Rauscher,* decided the same day as *Ker,* unequivocally rejects the broad formulation of the *Ker/Frisbie* doctrine.

Moreover, we note that even the government does not advance the broad reading of *Ker* that is sometimes suggested. According to the government, "[t]he *Ker–Frisbie* doctrine precludes a claim based on a treaty violation unless the treaty expressly grants a defendant the right not to be prosecuted." In other words, the government asserts that *Ker* is only a rule of construction. Quite apart from the fact that there is absolutely no discussion in *Ker* about implied versus express treaty provisions, the government's argument itself seriously undermines the broad reading of *Ker* because the government expressly acknowledges—as it properly is required to do in light of *Rauscher*—that violation of a treaty may under appropriate circumstances prevent a court from exercising jurisdiction over a defendant. As to whether an express provision barring prosecution is required: (a) there is no authority whatsoever supporting that proposition and (b) *Rauscher* and the other specialty cases, as well as *Cook,* are squarely to the contrary. Although *Cook* involved a seizure and a subsequent criminal penalty in the form of a fine, 288 U.S. at 108, 53 S.Ct. at 307, while *Rauscher* involved an extradition for a limited purpose and a subsequent prosecution, 119 U.S. at 409, 7 S.Ct. at 235, the principle is identical. In both cases the express provisions of the treaty regulated the acts of extradition or seizure. In neither was there any mention made of subsequent judicial proceedings. Yet in both cases the subsequent judicial proceedings and imposition of penalties were barred because the *implied* provisions of the treaties were violated.

## E

We conclude that a proper analysis of the cases does not support the contention that the broad view of *Ker* and its progeny has been adopted by the decision of any court. That does not mean that an argument cannot be made for such a view—or that there is not some dictum to that effect.[8] However, there is considerably more

---

8. *See United States v. Lovato,* 520 F.2d 1270, 1271 (9th Cir.1975) (relying on *Ker, Frisbie* and

dictum to the effect that the broad view of *Ker* does not apply to cases in which the government of the nation from which a defendant has been kidnapped protests the kidnapping,[9] and there are strong reasons why the sweeping interpretation of *Ker* should not be adopted.

As we have stated, it is an open question whether when the United States violates an extradition treaty with another nation by authorizing or participating in the forcible removal of an individual from that nation without that nation's consent, and, when over that nation's objection, the United States seeks to subject him to trial in this country, the defendant may interpose an objection to the assertion of personal jurisdiction over him. We now proceed to answer that question in light of the case law, the basic purposes of extradition treaties, and our understanding of the proper role of the courts.

### IV

### A

■ We begin by examining the purposes underlying extradition treaties. Under accepted principles of international law, in the absence of an extradition treaty there is no general *obligation* of nations to surrender persons sought by another nation, although a nation may surrender such individuals as a matter of comity and discretion. *Rauscher,* 119 U.S. at 412, 7 S.Ct. at 236. Nations enter into extradition treaties in order to impose such legal obligations on one another under appropriate conditions. *Id.; Factor v. Laubenheimer,* 290 U.S. 276, 287, 54 S.Ct. 191, 193, 78 L.Ed. 315 (1933). In exchange for its legal promise to surrender persons suspected or convicted of criminal activity to nation A in accordance with the terms of the treaty, nation B obtains a reciprocal promise from A. Whereas, absent the treaty, B would have no way to compel A to surrender an individual, the treaty provides such a method. In order to secure the benefits of international cooperation, the United States has entered into extradition treaties with over one hundred nations of the world. *See* Kester, 76 Geo.L.J. at 1489.

A typical extradition treaty—such as the one involved here—sets forth in great detail the steps that each nation must take in order to compel the other to abide by its treaty obligation. For example, it lists the crimes for which individuals may be extradited and those for which they may not be, the evidence that must be adduced to obtain extradition, and the method by which such evidence must be presented. Yet, as the government views extradition treaties in its brief, the requirements are pure formalities: according to the government, if the terms of an extradition treaty provide that nation A is not required to surrender a given individual to nation B, nation B is free to ignore the comprehensive scheme of the treaty and simply kidnap that person. Similarly, the government contends that if the terms of the treaty *do* provide for the return of the individual pursuant to explicit rules and set forth detailed procedures by which nation B may obtain jurisdiction over

---

Ninth Circuit cases for the proposition "that forcible return to the jurisdiction of the United States constitutes no bar to prosecution once the defendant is found within the United States").

9. *See United States v. Valot,* 625 F.2d 308, 310 (9th Cir.1980) (noting that "individual rights are only derivative through the states" and that "Thailand initiated, aided and acquiesced in Valot's removal to the United States"); *Matta–Ballesteros v. Henman,* 896 F.2d 255, 260 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990) ("Without an official protest, we cannot conclude that Honduras has objected to Matta's arrest. Therefore Matta's claims of violations of international law do not entitle him to relief."); *United States v. Zabaneh,* 837 F.2d 1249, 1261 (5th Cir.1988) ("Because neither Guatemala nor Belize protested appellant's detention and removal to the United States, appellant lacks standing to raise the treaties as basis for challenging the court's jurisdiction."); *United States v. Reed,* 639 F.2d 896, 902 (2d Cir. 1981) ("The fact that the United States has an extradition treaty with the Bahamas does not make any difference at all. The Bahamian government has not sought his return or made any protest ..."); *United States v. Cordero,* 668 F.2d 32, 37 (1st Cir.1981) (observing that neither "Panama [n]or Venezuela objected to appellants' departure from their territories"); *Waits v. McGowan,* 516 F.2d 203, 208 & n. 9 (3rd Cir. 1975) ("The pleadings do not allege that Canada has objected in any way to the removal of Waits to this country").

that person, nation B is perfectly free to ignore all of those rules and procedures, flout the laws of nation A, seize the individual and remove him forcibly from nation A's territory without the knowledge or consent of nation A. To give but one example of how the government's theory would work in practice, Iraq could kidnap the President of the United States without violating the United States/Iraq Extradition Treaty, April 23, 1936, 49 Stat. 3380, notwithstanding the fact that if Iraq followed the procedures set forth in that treaty, it would be most unlikely to succeed in obtaining custody over our Chief Executive. As the legal underpinning for its extraordinarily limited view of extradition treaties, the government argues that such treaties are of consequence only when they have been formally invoked by the United States, and that otherwise they do not limit our ability to take actions within the territory of other nations.

The government's contention that it is free to invoke or ignore extradition treaties at will, and that the terms of a treaty are "operative" only when it chooses to invoke the agreement blatantly contravenes the purposes underlying extradition treaties. The requirements extradition treaties impose constitute a means of safeguarding the sovereignty of the signatory nations, as well as ensuring the fair treatment of individuals. Thus, for example, Article Nine of the Treaty at issue in this case provides:

### Extradition of Nationals

1. Neither Contracting Party shall be bound to deliver up its own nationals, but the executive authority of the requested Party shall, if not prevented by the laws of that Party, have the power to deliver them up if, in its discretion, it be deemed proper to do so.

2. If extradition is not granted pursuant to paragraph 1 of this Article, the requested Party shall submit the case to its competent authorities for the purpose of prosecution, provided that Party has jurisdiction over the offense.

When Mexico receives an extradition request from the United States for one of its own nationals, it has two choices: it may in its discretion extradite that individual, or it may submit the case to its own authorities for prosecution. Nevertheless, the government would have us believe that there is no violation of the Treaty if Mexico is deprived of the opportunity to exercise both options under Article Nine. This reading renders Article Nine a pointless formality. The manifest purpose of Article Nine is to preserve each nation's right not to have its own nationals tried in the courts of the other without its consent. Reserving the right not to extradite nationals is *instrumental* to that aim. It cannot seriously be maintained that Mexico (or the United States) only wished to preserve the right not to have its citizens *formally* extradited. What possible purpose would such a provision serve? Article Nine only makes sense as a blanket reservation of each nation's sovereign interest in subjecting its own citizens to its own courts, limited only by its own purely discretionary power to deliver such citizens to the other nation upon a proper request.

Moreover, without the assumption that the Treaty's requirements must be followed whether or not the Treaty has been formally invoked, it would be impossible to make sense of other provisions of the Treaty which apply not only to nationals of the country from which extradition is sought, but to all individuals. For example, Article Five states that "[e]xtradition shall not be granted when the offense for which it is requested is political or of a political character," and gives the Executive of the requested nation the power to decide whether an offense is political. Article Five also states that "[e]xtradition shall not be granted when the offense for which extradition is requested is a purely military offense." In addition, Article Eight gives each nation the discretion to refuse to extradite anyone who might be executed for an offense for which the death penalty could not be imposed in the requested nation. Each of these provisions would be utterly frustrated if a kidnapping were held to be a permissible course of governmental conduct. These provisions of the Treaty at issue in this case are typical of

the numerous extradition treaties into which the United States has entered. As a general matter, the rules governing extradition procedures set forth in treaties only make sense if they are understood as *requiring* each treaty signatory to comply with those procedures whenever it wishes to obtain jurisdiction over an individual who is located in another treaty nation, unless the host country waives its treaty rights or consents to the obtaining of jurisdiction in a different manner. *See infra* at 1352–1355 (discussing waiver and consent).

Indeed, one of the rules embodied in all extradition treaties—either explicitly or implicitly—is the rule of specialty,[10] which forbids detention, trial or punishment for an offense other than that for which extradition has been granted. Like Articles Five and Eight of the Treaty at issue here, the rule applies to all individuals, not just nationals of the requested nation. Under the specialty rule, if a defendant were extradited from Mexico on an embezzlement charge, for example, he could only be tried for embezzlement, and not for extortion, even though he could have been extradited for either offense.[11] It follows *a fortiori* from the specialty principle that, if an individual has been kidnapped by a treaty signatory—i.e., if he has not been extradited for *any offense at all*—he may not be detained, tried or punished for any offense without the consent of the nation from which he was abducted. The manifest purpose of the rule of specialty is to ensure that an individual is only tried for a crime for which he has been extradited according to the terms of the treaty. It would elevate form over substance to hold that this protection of each sovereign nation's right to insist on strict compliance with the treaty may be circumvented if the other party simply chooses not to invoke the treaty at all.

The government's view of the purposes and effects of extradition treaties would convert those agreements from instruments for arranging orderly transfers between nations of persons wanted for suspected criminal activity, subject to certain agreed-upon limitations set forth in the treaties, into a license or charter for signatory nations to engage in unlawful conduct in all those categories of cases in which the treaty prohibits extradition. As we have noted, the treaty with Mexico, like many of our treaties, prohibits extradition for political or military offenses and permits the host nation to refuse extradition in capital cases. Under the government's view, since the terms of the treaty prohibit extradition in certain categories of cases but do not provide the exclusive means by which the nation desiring to obtain custody of an individual must seek such custody, the sole effect of the treaty with respect to those categories of cases is to preclude the possibility of the orderly return of individuals committing the described offenses and instead to mandate their unlawful seizure whenever the United States desires to obtain custody over them. Thus, instead of prohibiting the involuntary return of persons accused of political or military offenses or persons subject to execution, the treaty serves, in the government's view, to specify that custody over such persons may be obtained only by forcible seizure. Similarly, under the government's theory that there can be no violation of the treaty unless it is invoked—to return to our specialty example, once it is clear that the foreign government will only extradite a suspect for embezzlement and not for extortion, the government can simply drop its extradition proceedings, kidnap the individual, and try him for extortion without violating the treaty—because it has proceeded outside of the treaty framework. To us, viewed in this light the government's argument simply makes no sense whatsoever.

## B

Our conclusion that extradition treaties proscribe government-sponsored kidnappings gains support from general principles

---

**10.** *Rauscher* provides an example of an implicit rule of specialty, 119 U.S. at 422–23, 7 S.Ct. at 242, while the Treaty at issue in this case contains an express rule of specialty in Article 17.

**11.** The Treaty sets forth in its Appendix 31 crimes for which individuals may be extradited.

of international law. Whether or not an individual may make any claims grounded directly in international law, international law principles are relevant to the background assumptions that inform the making of extradition treaties. One of the most fundamental principles of international relations is the principle that the territorial integrity of a sovereign nation may not be breached by force. This principle is embodied in Article 17 of the Charter of the Organization of American States, Apr. 30, 1948, 2 U.S.T. 2394, T.I.A.S. No. 2361, as amended by the Protocol of Buenos Aires, Feb. 27, 1967, 21 U.S.T. 607, T.I.A.S. No. 6847, as well as numerous provisions of the United Nations Charter, June 26, 1945, 59 Stat. 1031, T.S. No. 993. (The United States and Mexico are signatories to both of these documents.) When it is recognized that international law does not permit one nation forcibly to remove an individual from another, the reason that extradition treaties typically do not expressly deny nations this power is apparent: it is assumed that such conduct is impermissible. And as we have stated, an extradition treaty only makes sense as a purposive document on this assumption.

### C

■ Our conclusion that extradition treaties prohibit government authorized or sponsored kidnapping of an individual from the jurisdiction of one signatory nation for the purpose of trying him in the courts of the other, does not mean that the two countries may not *agree* in an individual case that a fugitive should be delivered from one to the other without invoking the formal extradition process. As we have noted, treaties are in the nature of contracts between nations. Just as a private party may waive a term in a contract that is in the contract for his benefit, so a signatory to an extradition treaty may waive the requirement that the other signatory follow the procedures set forth in the treaty. Thus, the fact that there is an extradition treaty between two nations is no bar to one of those nation's *voluntarily* surrendering an individual to the other without invocation of the treaty. *See, e.g., United States*

*v. Valot,* 625 F.2d 308 (9th Cir.1980) (finding no treaty violation where Thai authorities surrendered defendant to United States authorities in Thailand). However, the fact that a nation may *consent* to surrender a fugitive outside of the extradition process without violating an extradition treaty does not bear upon the question whether a forcible removal of an individual *without the consent* of the nation in which he resides or has taken refuge constitutes a violation. It is one thing to say, as many cases do, that a rendering nation may waive extradition procedures without violating an extradition treaty. It is quite another to say that a forcible abduction of an individual by a treaty signatory without the acquiescence of the nation in which he resides or is taking refuge is consistent with such a treaty. As we have stated, no case so holds, and such a rule would frustrate the very purpose for which nations enter into extradition treaties.

■ Moreover, a nation may consent to the removal of an individual from its territory outside of the formal extradition process *after the fact,* by failing to protest a kidnapping. The analogy to private contract law is useful here as well. If A breaches an obligation he owes to B under a contract, B may choose not to hold A liable for the breach. Similarly, if the United States kidnaps an individual from Mexican territory in violation of the Treaty, Mexico may decide not to object to the kidnapping, and by its silence waive the Treaty's protection. Thus, the cases state that if a nation fails to register a formal complaint to a kidnapping by the United States, an individual may not invoke the treaty violation. *See supra,* n. 9. Because the kidnapping violates the *nation's* rights under the Treaty, the *nation* may waive those rights.

■ The foregoing considerations make clear that as a general proposition, if the United States authorizes or sponsors the kidnapping of an individual from another nation with which it has an extradition treaty, the kidnapping violates that treaty, but the other nation may by its prior con-

sent or its failure to object waive its objection to, or ratify, the unlawful act.[12]

### D

The government seeks to bolster its argument in support of the legality of government authorized or sponsored kidnapping by urging that in this case and others like it courts should adopt the views of the Executive Branch rather than seek to reach any objective conclusion regarding the meaning and effect of a treaty. As a general matter, "in resolving doubts the construction of a treaty by the political department of the government, while not conclusive upon courts called upon to construe it, is nevertheless of weight." *Factor*, 290 U.S. at 295, 54 S.Ct. at 196. Here, however, there are no "doubts" to resolve. Our review of the underlying purposes of extradition treaties, including the one between the United States and Mexico, leads us to conclude that they are not intended to permit or encourage government authorized or sponsored kidnappings. Thus, we have no occasion to turn to the

Executive's views. Moreover, even if those views were relevant, they do not support the position the government now espouses.

The government submits as evidence of the Executive's view on the issue now before us a letter from Edwin D. Williamson of the State Department addressed to the Attorney General in which Mr. Williamson makes the same arguments that the government has advanced here. The letter, which is dated September 26, 1990, responds to the Attorney General's request for the State Department's view of the district court's decision in the related case of *United States v. Caro-Quintero*, 745 F.Supp. 599 (C.D.Cal.1990). That case is currently the subject of a separate appeal in this court.

We do not find Mr. Williamson's views persuasive. Those views appear to have been adopted only with an eye towards the current litigation. However, before it became clear that the government intended to argue its present position, the Executive expressed a contrary view. For example,

---

**12.** The cases upholding personal jurisdiction over a defendant who claimed to have been kidnapped involve either (1) prior consent or participation by the government of the nation from which the defendant was forcibly removed or expelled, or (2) acquiescence by that government as demonstrated by a subsequent failure to protest. We now categorize the leading cases—including all the cases cited by the government in support of its position—that have upheld jurisdiction over a defendant who was forcibly removed or expelled from another nation for trial in the United States.

Cases involving prior consent or participation by the government of the nation from which the defendant was forcibly removed include: *Valot*, 625 F.2d at 310 ("Thailand initiated, aided and acquiesced in Valot's removal to the United States"); *Lovato*, 520 F.2d at 1272 (in a case not even involving a claimed treaty violation, characterizing Lovato's capture and surrender as a "routine expulsion of an undesirable alien"); *Stevenson v. United States*, 381 F.2d 142, 143–44 (9th Cir.1967) (voluntary surrender of fugitive by Mexico); *United States v. Kaufman*, 858 F.2d 994, 1006–09 (5th Cir.1988) (noting that Mexico surrendered the defendant and did not subsequently protest); *Cordero*, 668 F.2d at 37 (Panamanian and Venezuelan authorities deported defendants and did not subsequently object to their trial in the United States); *United States v. Evans*, 667 F.Supp. 974, 979 (S.D.N.Y.1987) (Bermuda voluntarily deported defendant and

did not protest thereafter). We note that the references in some of these cases to the foreign nation's failure to protest are superfluous. When a nation consents in advance to or participates in the removal of an individual from its territory, that fact alone means that the protection of the extradition treaty has been waived.

Cases in which the foreign government may not have consented in advance but acquiesced thereafter by failing to object to trial in the United States include: *Matta-Ballesteros*, 896 F.2d at 260 (discussed *supra*, n. 9); *United States v. Toro*, 840 F.2d 1221, 1235 (5th Cir.1988) ("neither party to the treaty has objected"); *Zabaneh*, 837 F.2d at 1261 (discussed *supra*, n. 9); *Reed*, 639 F.2d at 902 (discussed *supra*, n. 9); *McGowan*, 516 F.2d at 208 & n. 9 (discussed *supra*, n. 9); *United States ex rel Lujan v. Gengler*, 510 F.2d 62, 67 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) (defendant cannot claim a violation of an international agreement in the absence of a protest by a signatory state) (discussing, *inter alia*, Eichmann case); *United States v. Sobell*, 244 F.2d 520 (2d Cir.), *cert. denied*, 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77 (1957) (no indication that Mexico had protested); *United States v. Yunis*, 681 F.Supp. 909, 916 (D.D.C.1988) ("there is no evidence that Lebanon or Cyprus objected or protested to the circumstances under which Yunis was arrested. Absent such formal protests, defendant is precluded from raising his objection.")

in commenting on an incident in which agents of the state of Florida allegedly kidnapped a Canadian national, then Secretary of State George Schultz remarked that in light of the extradition treaty between the United States and Canada, the kidnapping could be considered "a violation of the treaty and of international law, as well as an affront to [Canada's] sovereignty." *Contemporary Practice of the United States Relating to International Affairs,* 78 Am.J.Int'l.L. 207, 208 (1984). Then Legal Advisor to the State Department Abraham Sofaer expressed a similar view before Congress when he testified that "seizures by United States officials of terrorist suspects abroad [might be] incompatible with the bilateral treaties that we have in force with [other] nations." Hearings on S. 1429 Before the Subcomm. on Security and Terrorism of the Senate Comm. on the Judiciary, 99th Cong., 1st Sess. (1986). And in commenting on an earlier extradition treaty with Mexico, Secretary of State James Blaine stated unequivocally that the treaty "does not authorize either party, for any cause, to deviate from [its] forms or arbitrarily abduct from the territory of one party a person charged with crime, for trial within the jurisdiction of the other." Letter to O.R. Roberts, Governor of Texas (May 3, 1881), in *Domestic Letters of the Department of State,* 1784–1906 (National Archives Microfilm Publication M40, Roll 93). In light of these longstanding views of the State Department, we must view its recent change of heart with some skepticism. At the most, the letter from Mr. Williamson shows that the views of the Executive on the subject before us are unclear or ambivalent. This would hardly call into question our resolution of the issue.

## E

As we have already indicated, the general principles of extradition treaty interpretation discussed above are applicable to the specific treaty we consider here. The government notes that the text of the treaty with Mexico is silent with respect to the precise question before us—i.e., whether the Treaty prohibits one signatory nation from abducting an individual from the other signatory nation's territory, for the purpose of trying him, when the nation from which he is abducted formally protests. According to the government, this silence is dispositive: the Treaty constitutes no bar to government authorized or sponsored kidnapping. However, as our foregoing discussion illustrates, the government hears far more in the sounds of the Treaty's silence than is warranted. The entire purpose of the Treaty, as well as treaty law in general, compels the opposite conclusion.

At this point, we would add only that *Rauscher* demonstrates that an extradition treaty may have implicit as well as explicit terms. As we have noted, the treaty at issue in *Rauscher* did not contain an express specialty principle. In *Rauscher* the government argued that the absence of such an express statement meant that no implicit principle could be inferred. The Court rejected this argument because it would have rendered purposeless most of the provisions of the treaty—including the requirement that a country seeking extradition prove that the individual sought has committed one of the enumerated crimes for which one may be extradited. 119 U.S. at 422–23, 7 S.Ct. at 242. *Rauscher* and subsequent cases stand for the uncontroversial proposition that in construing treaties we must look to their purposes and implicit assumptions as well as their express proscriptions and prescriptions. *See, e.g., Cook v. United States,* 288 U.S. 102, 121–22, 53 S.Ct. 305, 312, 77 L.Ed. 641 (citing *Rauscher,* and holding that in light of the purposes of 1924 treaty with Great Britain, the grant of permission to board vessels within one hour's sailing distance of three miles off the coast of the United States, impliedly forbade boarding of vessels that were further away). Here, we do just that.

As our general discussion and the examples of provisions of the Treaty that we have considered above demonstrate, "the text of the treaty and the *context in which the written words are used,*" *Air France v. Saks,* 470 U.S. 392, 397, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985) (emphasis added), clearly support the conclusion we

reach. To summarize that conclusion, we hold that extradition treaties provide a comprehensive means of regulating the methods by which one nation may remove an individual from another nation for the purpose of subjecting him to criminal prosecution, and that unless the nation from which an individual has been forcibly abducted consents to that action in advance, or subsequently by its silence or otherwise waives its right to object, a government authorized or sponsored abduction constitutes a breach of the treaty. To hold to the contrary would seriously undermine the utility and vitality not only of our extradition treaty with Mexico but of all of our extradition treaties.

V

■ We must now address the question whether, if the nation from which an individual has been kidnapped by the United States formally objects, the individual has standing to raise the objection in a criminal trial as a bar to the court's exercise of personal jurisdiction over him.

A

The principal argument against finding that an individual defendant has standing to raise the issue of his kidnapping in violation of an extradition treaty is the claim that issues relating to a treaty violation should be resolved by the governments of the United States and Mexico as a matter of diplomacy. Whatever might be said in favor of a rule that a defendant's remedy for violation of an extradition treaty must lie with the political branches of government only, that rule was rejected long ago, when the Supreme Court held that an individual defendant may raise a violation of the principle of specialty as an objection to jurisdiction. *See Rauscher,* 119 U.S. at 424, 7 S.Ct. at 243. Our decisions involving the principle of specialty make clear that in those cases at least "the person extradited may raise whatever objections the rendering country might have." *United States v. Najohn,* 785 F.2d 1420, 1422 (9th Cir.) (per curiam), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 652, 93 L.Ed.2d 707 (1986). Thus, were Verdugo's complaint grounded in a violation of the rule of specialty, there would be no doubt that he would have standing to raise the Treaty violation as a bar to personal jurisdiction.[13]

We see no reason why the rule applicable to specialty cases should not also apply in the case of a government authorized or sponsored kidnapping that violates an extradition treaty. The relevant factors bearing on whether a defendant should have standing are nearly identical in the two cases. Both concern a criminal prosecution. In both cases, the defendant objects to the process by which he has been brought before the court. In both cases the government of the country from which he has been removed has registered its objection—in one instance by a formal protest and in the other by expressly limiting the grant of extradition to trial for specific offenses. *See supra,* n. 13. Finally, both cases concern rights rooted in an extradition treaty, and as a consequence, both cases touch upon the foreign relations of the United States and the other signatory

13. While the Second, Fifth and Sixth Circuits allow a defendant to raise a specialty violation only when the nation from which he has been extradited formally protests, the rule is otherwise in the Eighth, Ninth and Eleventh Circuits. *See Leighnor v. Turner,* 884 F.2d 385, 388 & n. 4 (8th Cir.1989) (collecting cases). In our circuit, a defendant may raise the objections of the nation from which he has been extradited unless that nation affirmatively consents to a trial on other charges. *See Najohn,* 785 F.2d at 1422. Our rule appears to be based on the belief that once there has been a formal extradition proceeding in the requested nation, that nation's agreement to extradite only on specific charges must be construed as the equivalent of a formal objection to his trial on other charges. Thus, in specialty cases we do not require an additional formal protest before permitting the defendant to raise the objections of the requested nation. The contrary rule of the Second, Fifth and Sixth Circuits is apparently based on the view that a specific official protest is required *after* the defendant has been extradited to ensure that the government of the requested nation has not changed its mind and that it still wishes to assert the objection it previously entertained. In any event, the circuit split is not material to the present case, because Mexico has formally protested the treaty violation. Thus, were this a specialty case, Verdugo would be entitled to assert the treaty violation under either rule.

to that treaty. Whatever concerns for the principle of separation of powers may be implicated in a case such as this one are implicated in precisely the same degree in the specialty cases—where we have long had no difficulty finding that an individual has standing to raise the treaty violation.

We recognize that there are some differences between a specialty case and a kidnapping case. None, however, militates in favor of a different result with respect to the standing question. We will consider the differences briefly. First, in a specialty case it is the United States itself which invokes the extradition treaty, while in a kidnapping case it is the other signatory nation which does so. This distinction is without legal significance. In both cases, a party to the treaty has invoked its provisions.

Next, the government argues that the reason for granting standing in the specialty case is that the United States has formed a "contract of extradition" with respect to the particular defendant. This argument runs counter to the government's position that the reason an individual defendant may not raise a treaty objection to a kidnapping is that a treaty is an agreement between nations and the defendant is not a party to that agreement. Both an overall treaty and a specific extradition agreement are in fact contracts between nations. In neither case is the individual a party. The fact that the extradition treaty relates to a class of individuals while a "contract of extradition" relates to a particular individual is of no consequence because neither the treaty as a whole nor the individual extradition agreement contains any provision conferring standing on any individual. Furthermore, there is no logical reason why the violation of an agreement relating to a particular individual should be litigable by that individual, while a particular violation of an agreement relating to a class of individuals should not be litigable by a member of the class when the violation concerns that class member. The specialty cases permit an individual who is not a party to an agreement between the United States and a foreign nation to assert the rights of that nation in our courts. We see no reason in logic or experience why the individual victim of our government's breach of other aspects of an extradition treaty should not be able to assert a signatory nation's rights in our courts as well.

Indeed, in our view, the case for affording standing to the individual defendant is even more compelling in a kidnapping case than in a specialty case. Although a violation of the principle of specialty constitutes a serious breach of the obligations of the United States, such a breach occurs only after the United States has initially complied with the procedures set forth in the treaty. By contrast, a kidnapping is a flagrant treaty violation because it wholly circumvents the extradition process, and with it the commitment of the United States to follow the rule of law in its international relations.[14] The injury in the case of a kidnapping is more egregious, not only to the offended nation but to the wronged individual as well. In any event, we fail to see the logic of the government's argument that the defendant has standing to object to personal jurisdiction in cases in which the United States has invoked the treaty but not in cases in which the treaty is invoked by the other signatory, particularly in light of the fact that the individual's right is "derivative" of the rights of that other nation and it is the other nation, not the United States, which bargained for the provision which benefits the aggrieved individual.

Thus, we conclude that the rule which permits an individual defendant to raise a treaty violation as a basis for precluding the exercise of personal jurisdiction in a specialty case is equally applicable in a government authorized or sponsored kid-

---

**14.** The government nonetheless attempts to distinguish the specialty cases by pointing out that the Treaty contains an express specialty provision. As we concluded in part IV(E), *supra,* this distinction is of no consequence. A defendant has standing to raise specialty objections even when a treaty contains no express specialty provision. *See Rauscher,* 119 U.S. at 424, 7 S.Ct. at 243.

napping case, the only difference being that in the kidnapping case there must be a formal protest from the offended government after the kidnapping, while in the specialty case, in some circuits (including ours) the foreign government's original statement of limitation is deemed sufficient to constitute the requisite protest. *See supra,* n. 13.

### B

Our conclusion is in no way inconsistent with the principle of separation of powers and the Executive's responsibility for conducting foreign policy. The short explanation for why this is so is that the courts of the United States have long so held in the specialty cases. Furthermore, a significant role for the courts in the interpretation of extradition treaties is justified because courts are the forum in which extradition issues typically arise. Generally, individuals are extradited or brought here in violation of a treaty for the express purpose of subjecting them to criminal prosecution. It hardly needs pointing out that such prosecutions cannot take place in any forum but a court.

Moreover, supervision of the extradition process is uniquely the province of the courts. Congress has expressly delegated to the courts the responsibility for determining whether an individual within the United States may be extradited to another nation pursuant to a treaty. *See* 18 U.S.C. § 3184 (1988). In so doing, Congress entrusted to the courts the power to make precisely the kinds of interpretative decisions at issue in this case. Contrary to the government's suggestion, a judge who determines that a defendant has been brought into court in violation of an extradition treaty has not "injected" the judiciary into a political dispute. He or she has merely carried out the court's constitutional function in light of the statutes Congress has seen fit to pass and the treaties it has ratified.

We also reject the government's suggestion that permitting individual standing in cases such as this one will lead to a significant expansion of the role of the courts in the area of international relations. As we have stated, the fact that we have allowed individual standing in the specialty cases belies any suggestion that extradition treaties have not heretofore been enforceable by our courts on behalf of individuals. Moreover, we can assume, with a considerable degree of confidence that our courts will not be flooded with cases in which the United States government, in defiance of its treaty obligations and of international law, has authorized or sponsored the kidnapping of individuals from foreign lands. Finally, we note that numerous other treaty rights have long been enforceable in our courts by individuals.[15] In light of this long tradition of judicial enforcement of treaties by private parties, we find no merit in the government's position that granting individual standing here would amount to judicial encroachment into a purely Executive realm.

### C

Furthermore, we reject the government's contention that the legality of Verdugo's abduction is a nonjusticiable political question. The government cites *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), for the proposition that when there are no "judicially discoverable and manageable standards for resolving" a question, or

---

**15.** *See, e.g., Clark v. Allen,* 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947) (inheritance rights under treaty with Germany); *Bacardi Corp. of America v. Domenech,* 311 U.S. 150, 61 S.Ct. 219, 85 L.Ed. 98 (1940) (trademark rights under multilateral treaty); *Asakura v. Seattle,* 265 U.S. 332, 44 S.Ct. 515, 68 L.Ed. 1041 (1924) (right of alien to engage in trade under treaty with Japan); *Ware v. Hylton,* 3 U.S. (Dall.) 199, 1 L.Ed. 568 (1796) (right to collect private debts under treaty with Great Britain).

*Cook v. United States,* 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933), is particularly relevant in this regard. Like the present case, *Cook* involved a seizure, albeit one of property rather than a person. The Court permitted Cook to rely upon a treaty between the United States and Great Britain that regulated the boarding by United States officials of British vessels located in international waters. The Court held that the vessel's seizure and the subsequent imposition of a fine violated the treaty and were therefore unlawful. *Id.* at 121, 53 S.Ct. at 312.

when its proper resolution requires "initial policy determination[s] of a kind clearly for nonjudicial discretion," courts may not decide the question. *Id.* at 217, 82 S.Ct. at 710. This is certainly a correct general statement, but *Baker* itself illustrates that it has no application here. As the Court stated in *Baker,* "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.* at 211, 82 S.Ct. at 707. Thus, for example, the courts may generally interpret treaties notwithstanding the effects such interpretation may have on foreign affairs, *see supra,* n. 15. On the other hand, it will not generally be assumed that decisions requiring the exercise of "Presidential discretion" with respect to issues of foreign policy are subject to judicial review. *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948) (holding that President's discretionary award of overseas airline routes is not subject to judicial review). *See also United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 319–20, 57 S.Ct. 216, 220–21, 81 L.Ed. 255 (1936) (holding that Congress may delegate greater authority to the President in matters of foreign policy than in matters of domestic policy).

It is clear that the resolution of Verdugo's claim will not involve the courts in decisions that are properly the subject of Executive discretion. Although "the courts of one country will not sit in judgment on the acts of the government of another done within its own territory," *Oetjen v. Central Leather Co.,* 246 U.S. 297, 303, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918), the Supreme Court has stated in a case involving the very defendant now before us, that restrictions on extraterritorial searches and seizures conducted by our *own* government may "be imposed by the political branches through diplomatic understanding, *treaty,* or legislation." *United States v. Verdugo–Urquidez ("Verdugo I"),* 494 U.S. 259, 110 S.Ct. 1056, 1066, 108 L.Ed.2d 222 (1990) (emphasis added).[16] Our courts have a long tradition of scrutinizing the legality of governmental conduct during the course of a criminal prosecution. While such scrutiny may "touch upon" foreign relations—in much the same way that the trial of a foreign national itself touches on foreign relations—it does not call for judges to exercise the kind of discretion that is committed to the Executive Branch. Rather, it calls upon them to perform the same type of fact-finding function that they regularly perform on a day-to-day basis in determining circumstances relating to the arrest or seizure of a person.

Finally, it is worth recalling that the government concedes that an extradition treaty which expressly states that a government authorized or sponsored kidnapping breaches the treaty and bars prosecution of the kidnapped individual would confer standing on an individual to raise an objection to personal jurisdiction based on a kidnapping. Of course, the foreign policy implications of a kidnapping in violation of an extradition treaty are precisely the same in a case in which the treaty contains an express provision for standing as in a case in which it does not. Thus, the government's concession suggests that even it recognizes that allowing standing to an individual to protest a government authorized or sponsored kidnapping would not work an intolerable intrusion of the judiciary into the affairs of the Executive.

We conclude that the political question doctrine does not bar Verdugo's assertion of the Treaty violation. Therefore, Verdugo may raise his claim that he was kidnapped in violation of the Treaty as a means of challenging the jurisdiction of the district court over his person.[17]

**16.** In *Verdugo I* the Court held that the fourth amendment does not apply of its own force to searches and seizures by United States agents of property that is located in a foreign country. Although the Court could have ruled that fourth amendment scrutiny of such extraterritorial searches is barred by the political question doctrine even if the fourth amendment does have extraterritorial effect, the Court instead reached the merits. It then included the language cited in the text regarding the possibility of imposing fourth amendment limitations by treaty.

**17.** The government also argues that Verdugo may not rely on the Treaty because an implicit

## VI

■ As we have stated, the district court denied Verdugo's motion for an evidentiary hearing based on its view that even if the United States had authorized or sponsored his kidnapping, he would not be entitled to interpose an objection to the court's exercise of personal jurisdiction on that ground. As we have concluded, that determination was in error. We do not decide, however, whether the United States in fact authorized or sponsored Verdugo's kidnapping without the consent of the Mexican government. The issue before us is only whether Verdugo is entitled to an evidentiary hearing on that question. We hold that he is.

Verdugo has alleged that local police officers, acting not on behalf of the government of Mexico, but on the instructions of the Drug Enforcement Agency, were responsible for his abduction. In support of his allegations he has attached the formal protest of the Mexican government, which contends that Verdugo's "kidnappers" were surreptitiously acting on behalf of the United States. Even the Department of State's response to the Mexican protest acknowledges that the local police officers acted in "cooperation" with the United States. In light of the Mexican government's formal protest and its assertion that Verdugo was kidnapped by agents of the United States government, we cannot assume in the absence of an evidentiary hearing that Verdugo's allegations are without merit.

The Mexican government's protest necessarily requires a hearing with respect to any assertion by the United States that Verdugo was voluntarily turned over to our government. We know of no case in which it was found that another nation voluntarily surrendered an individual to the United States notwithstanding the fact that the other nation itself protested that the individual had been abducted without its consent by our government. *Contrast Valot*, 625 F.2d 308. In fact, a voluntary surrender would be inconsistent with a good faith protest. Nevertheless, we do not exclude the possibility that the Mexican government in fact participated in and therefore consented to Verdugo's apprehension and removal.[18] The district court should inquire into this possibility as well.

## VII

### A

By order of this court, the parties were directed to inform us of their views as to the appropriate remedy in the event that we ultimately were to conclude that the Treaty was violated and that the violation defeated jurisdiction in the court below. Verdugo has suggested that the appropriate remedy in such a case would be to repatriate him to Mexico.[19] We agree.

Like all extradition treaties, the Treaty at issue here provides for specific steps that must be taken before an individual may be extradited. These steps require the exercise of discretion and judgment by

term of a treaty can never be self-executing. We reject this suggestion. A self-executing treaty is one which, of its own force, confers rights on individuals, without the need for any implementing legislation. *Rauscher* illustrates that an implied term of a treaty may be self-executing. As we have stated, *supra* at 1354, in *Rauscher* the Supreme Court found an *implicit self-executing* specialty principle. *See Rauscher*, 119 U.S. at 419, 7 S.Ct. at 240. The inquiry into whether a treaty is self-executing does not focus on whether a particular term is express or implied but on: "(1) the purposes of the treaty and the objectives of its creators, (2) the existence of domestic procedures and institutions appropriate for direct implementation, (3) the availability and feasibility of alternative enforcement methods, and (4) the immediate and long-range social consequences of self- or non-self-execu-

tion." *Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279, 1283 (9th Cir.1985). For the reasons we have already discussed, we have no doubt that the Treaty and the implicit no-kidnapping provision are self-executing.

**18.** In Verdugo's separate trial on narcotics charges, District Court Judge J. Lawrence Irving interviewed the Mexican police officers who were apparently involved in Verdugo's apprehension. The sealed transcript of these interviews suggests the possibility of involvement by high level Mexican officials. The district court should determine in the first instance the evidentiary value of this transcript, if any.

**19.** The government has chosen not to address our question, relying instead on its argument that there is no treaty violation to remedy.

the authorities of the requested nation. For example, Article Ten of the Treaty sets forth the legal and factual showing that must be made before the government of either the United States or Mexico is obliged to comply with an extradition request by the other. Article 12 entitles the government of the requested nation to request additional evidence in the event that it is not satisfied with the evidence initially adduced. Furthermore, under Article 13, all extradition requests must be "processed in accordance with the legislation of the requested party." Finally, the Treaty gives each nation the discretion not to extradite: individuals charged with political or military offenses; individuals who may be executed; and individuals who (like Verdugo) are nationals of the requested nation, so long as the requested nation subsequently submits the case to the proper domestic authorities for prosecution.[20]

When the United States asks another treaty nation to surrender custody over an individual, that other nation has the right to exercise its discretion and to make the necessary legal and factual determinations that are required by the treaty. In some instances this may result in a decision by the other government not to surrender the person demanded. If the United States breaches the treaty by authorizing or sponsoring the kidnapping of an individual from the other nation's territory, it deprives the other government of its rights to exercise its discretion and make the appropriate factual and legal determinations. In order to restore the offended nation to the position in which it would have been had the United States complied with the treaty, the United States must offer to surrender custody of the kidnapped individual to the foreign government. Only then can that government exercise its rights under the treaty. Therefore, should the district court conclude on the basis of the evidentiary hearing that the United States authorized or sponsored Verdugo's kidnapping, it shall order the United States to tender Verdugo to the Mexican authorities.

### B

In its letter of August 26, 1987, the Mexican government made it clear that its earlier letter was to be regarded as "a formal complaint regarding the kidnaping," *and* that it wished the "U.S. judicial authorities" to be informed "of the position of the Mexican government." The clear purpose of the letter was to call the court's attention to the Treaty violation and the court's resulting lack of personal jurisdiction over Verdugo and to provide the requisite foundation for proceedings leading to the granting of the appropriate judicial relief. However, the government argues that the only purpose of the letters from the Mexican Embassy to the United States Department of State was to attempt to resolve the issue through diplomatic channels. We disagree. In this case, the Mexican government did not simply file a formal protest with the Executive branch. It took the added step of asking the Executive branch to refer the matter to the judicial branch.[21] Clearly, the Mexican government believed that the effect of its letter would be to permit the issue of Verdugo's kidnapping to be raised in the pending criminal proceedings.[22]

---

**20.** The provisions relating to capital punishment and the extradition of nationals expressly grant the requested nation the *discretionary* power to refuse extradition under appropriate circumstances. The provision relating to political and military offenses, on the other hand, states that extradition "shall not be granted" for such offenses. This provision is "discretionary" in the sense that the requested nation may waive its rights under the Treaty whenever it chooses to do so. *See supra* at 1350.

**21.** We do not suggest that anything more than an official protest by the offended government to the Executive Branch is required in order to afford standing to a defendant in a criminal proceeding. We merely point out that here the Mexican government did more.

**22.** Judge Browning contends that we should not decide that Mexico's formal protest confers standing on Verdugo to interpose an objection to the district court's exercise of jurisdiction over him based on the alleged kidnapping. *Post* at 1363. He would remand to the district court for a determination whether a "formal complaint" addressed to the "judicial authorities" of the United States constitutes a sufficient protest if the formal complaint does not also expressly request the remedy of repatriation. However, the government does not take the position that

We should point out that a government may withdraw a protest after it has been lodged. Once it does so, it is generally accepted in international law that the individual no longer has standing to object to the exercise of jurisdiction over his person. The case of Nazi war criminal Adolf Eichmann is illustrative. Eichmann was abducted from Argentina by Israeli agents. Initially, Argentina protested the abduction, but before Eichmann was tried Argentina and Israel reached a diplomatic settlement that did not call for Eichmann's return to Argentina. Accordingly, when Eichmann attempted to object to the jurisdiction of the Israeli court based on the fact that he had been abducted from Argentina by Israeli agents, the court held that there was no bar to jurisdiction in light of Argentina's withdrawal of its protest. *Attorney General v. Eichmann*, 36 Int'l L.Rep. 18, 70–71 (Dist.Ct.Israel, 1961), *affirmed* 36 Int'l L.Rep. 277 (Sup.Ct.Israel 1962).[23] If the Mexican government were

an express repatriation request is necessary, even though it filed three briefs in our court advancing other arguments against the conclusion that Verdugo has standing. The parties have asked us to decide the *legal* question whether Mexico's formal protest conferred standing on Verdugo. There is simply no justification for remanding to the district court for consideration of an unmeritorious argument that neither party has raised.

Turning to the merits of the legal question which Judge Browning would have us remand to the district court, the view that an express "repatriation" request is necessary is contrary to the only pertinent statements found in American decisional law. None of the principal cases discussing derivative standing suggests that anything more than a formal protest is required. Those cases all discuss derivative standing to complain about a treaty *violation* without mentioning standing to request the specific *remedy* of repatriation. *See, e.g., Matta–Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir.1990); *United States v. Cordero*, 668 F.2d 32, 38 (1st Cir. 1981); *United States v. Reed*, 639 F.2d 896, 902 (2d Cir.1981); *United States v. Valot*, 625 F.2d 308, 310 (9th Cir.1980); *United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975).

Moreover, we do not agree with our partially dissenting colleague that under international law anything more than a formal protest is required. At least one leading commentator has asserted that even a formal protest is not necessary. *See* M. Bassiouni, *International Extradition: United States Law and Practice* § 5.4 at 236 (2d rev. ed. 1987). As for the *Restatement (3d) The Foreign Relations of the United States* § 432 at 330 (1987), it does state categorically that "[i]f the state from which the person was abducted does not demand his return, under the prevailing view the abducting state may proceed to prosecute him under its laws." However, what the authors of the Restatement mean by "demand his return" is far different from what Judge Browning suggests. The Reporters' Note to the Restatement uses as illustrations of what is required the cases of individuals who were returned on the basis of a simple "protest," and

not of an express unequivocal repatriation "demand" by the government of the offended nation. *See id.* at 331–32, Reporters' Note 3. The only actual case in which a court has taken the position that a specific repatriation demand is necessary for a defendant to raise a treaty objection to an abduction is a decision of the German Supreme Court cited by Judge Browning. *See post* at 1366 (citing 19 GGART 25 *Verfahrenshindernis wegen Verletzung von Hoheitsrechten reprinted in* 1985 *Neue Zeitschrift fur Strafrecht* STZ 464). And even in that decision the statement was dictum, since the note from the Dutch embassy did not meet the German Constitution's requirement that the foreign government formally object to the defendant's prosecution. *See post* at 1366. In any event, we do not find the German view persuasive and it is, of course, hardly binding on our court. In light of the above, we must reject our colleague's suggestion that we adopt an additional procedural requirement that the government of the United States has not requested and that in this case might retroactively deprive the Mexican government and the individual defendant of their remedy.

Finally, we disagree with Judge Browning that the district court should engage in factual hearings regarding the true intent of a foreign government. By contrast with the factual inquiry surrounding the circumstances surrounding Verdugo's abduction, the kind of fact-finding involved in the hearing Judge Browning would require comes dangerously close to the inquiries forbidden under the political question doctrine. *See supra,* part V(C). In any event, such a hearing is unwarranted because the Mexican government's protest should be judged on its face as a matter of law; as such we have held it to be sufficient.

**23.** Judge Browning cites *Eichmann* as an example of a case in which personal jurisdiction over a kidnapped individual was deemed proper because the nation from which he was abducted did not expressly demand his repatriation. *See post* at 1366. In fact, the exercise of jurisdiction over Eichmann was proper because at the time the court conducted its proceedings there was no longer any outstanding protest of any kind by the Argentine government. Although Argen-

to withdraw its formal protest, Verdugo would no longer be entitled to object to the court's exercise of personal jurisdiction over him. At the time of the evidentiary hearing the Mexican government is free to inform the district court directly or through the United States government of any change with respect to the status of its protest.

Finally, we should point out that a decision by Mexico not to accept repatriation of Verdugo would be tantamount to a withdrawal of its protest. A country that lodges a protest which affords a defendant standing to object to personal jurisdiction must be willing to accept the necessary consequences of that action. The nation that has unlawfully obtained jurisdiction over an individual cannot be expected to turn him loose within its borders. Rather, its obligation is to offer to return him to the nation whose treaty rights were violated. Having done so, it has satisfied its treaty obligations and remedied the breach.[24] If the offer is rejected, no barrier exists to its reassertion of personal jurisdiction and the reinstatement of any previously dismissed indictment or judgment of conviction and sentence.

## VIII

An extradition treaty is a two-way instrument. That which it forbids one nation to do it does not permit the other to do either. Similarly, if one nation is free to engage in a particular form of conduct, so is the other. Were we to hold, as the government urges, that the United States may invade the sovereign territory of Mexico and kidnap an individual without violating this nation's treaty obligations, it would follow inexorably that no treaty bar exists to similar acts by foreign governments against citizens of the United States in this country. We cannot accept the view that the United States negotiated extradition

treaties with over one hundred nations of the world without intending to protect its own citizens against such intentional lawlessness. And while our holding as to standing—that a person kidnapped in violation of an extradition treaty may raise the treaty violation in a judicial proceeding—may not guarantee reciprocal treatment of United States citizens in foreign lands, a contrary ruling would surely provide other nations with a reasonable basis for denying Americans access to relief in their courts.

The fact that our decision today may ultimately result in the release to Mexico of a convicted felon should not obscure the larger meaning of this case. Although the principle of *pacta sunt servanda* (agreements must be obeyed) has not always been scrupulously followed in the affairs of this and other nations, if we are to see the emergence of a "new world order" in which the use of force is to be subject to the rule of law, we must begin by holding our own government to its fundamental legal commitments.

## CONCLUSION

Verdugo has alleged sufficient facts to warrant an evidentiary hearing on the question whether the United States authorized or sponsored his abduction. Consequently, we remand the matter to the district court for the limited purpose of permitting it to conduct such a hearing, to receive any further communications from the Mexican government, to rule on Verdugo's motion to dismiss, and if necessary, to order his release to the Mexican authorities. We retain jurisdiction over any further appellate proceedings that may be required.

REMANDED FOR THE LIMITED PURPOSE OF CONDUCTING SUCH FURTHER PROCEEDINGS AS MAY BE CONSISTENT WITH THIS OPINION.

---

tina originally demanded Eichmann's return, it subsequently withdrew the entire protest. Israel and Argentina issued a joint communique stating that they had decided to regard the entire incident as closed. *See* M. Pearlman, *The Capture and Trial of Adolph Eichmann* 79 (1963) (quoting the communique).

**24.** Our statement that an offer of return serves to remedy the breach is made for purposes of the issues before us only. Whether additional remedies, voluntary or otherwise, are necessary or appropriate for other purposes affecting the two countries involved is a matter that does not concern us here.

JAMES R. BROWNING, Circuit Judge, concurring in part and dissenting in part.

I

The court holds that all extradition treaties to which the United States is a party, including the Mexican–American Extradition Treaty, bar the United States from arresting any suspect within the territory of any other signatory nation. *See supra* at 1362.

I would rest our holding solely on the ground that Article 9 of the Mexican–American Extradition Treaty bars the United States from arresting a Mexican national like Verdugo within the territory of Mexico. This does not imply that I would disagree with the court's ruling if I were to reach it, but only that I believe our ruling should be no broader than required for the disposition of the case before us, particularly in a developing area of the law.

Article 9 of the Treaty provides:

### Extradition of Nationals

1. Neither Contracting Party shall be bound to deliver up its own nationals, but the executive authority of the requested Party shall, if not prevented by the laws of that Party, have the power to deliver them up if, in its discretion, it be deemed proper to do so.

2. If extradition is not granted pursuant to paragraph 1 of this Article, the requested Party shall submit the case to its competent authorities for the purpose of prosecution, provided that Party has jurisdiction over the offense.

The text of Article 9 plainly reveals the intent of each of the contracting nations to retain absolute discretion to decide whether its own nationals shall be tried in its own courts, or in those of the other contracting nation. The Treaty declares "Neither Contracting Party shall be bound to deliver up its own nationals," Treaty, Article 9, ¶ 1, but imposes on each nation an obligation to prosecute its nationals whom it chooses not to extradite. Treaty, Article 9, ¶ 2. As the court states, these requirements "only make[] sense as a blanket reservation of each nation's sovereign interest in subject-ing its own citizens to its own courts, limited only by its own purely discretionary power to deliver such citizens to the other nation." *See* supra at 1350.

Other indicia suggest this intent. The Mexican Extradition Law of 1975 prohibits the government of Mexico from extraditing its own nationals. Ley de Extradicion Internacional, Diario Official de la Federacion Mexicana (Dec. 29, 1975). The purpose of the statute is to guarantee Mexican nationals the protections of their own judicial system, shielding them from the uncertainties of exposure to those of other nations. So important is this right to Mexico that since the adoption of its Constitution at the turn of the century it has never entered into any Treaty obligating it to extradite its own nationals. Garcia–Moreno & De La Fuente, *La Nueva Ley Mexicana de Extradicion Internacional*, 1 Revista Mexicana de Justicia 47, 56–57 (Sept.–Oct. 1979).

When the United States entered into the Mexican–American Extradition Treaty, it knew the Treaty was intended to confine prosecution of Mexican citizens to Mexican courts. In submitting the Treaty to the Senate for ratification, Secretary of State Vance wrote "Article 9 ... takes into account the law of Mexico prohibiting the extradition of its nationals but allowing for their prosecution in Mexico...." Senate Exec.Rep. No. 21, 96th Cong., 1st Sess. 6 (1979) (Letter of Submittal). Since it is inconceivable that Mexico would enter into a treaty designed in part to protect the right of Mexican nationals to be tried only in their own courts, and yet agree that the United States retained power to kidnap and try Mexican nationals in United States courts without the consent of Mexico, Article 9 must be read as prohibiting the kidnapping of Mexican nationals in Mexico.

If the United States kidnapped Verdugo in violation of Article 9 and Mexico did not acquiesce, the courts of the United States are bound to enforce the Treaty and decline to exercise jurisdiction over the defendant. The Supreme Court made this clear in *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), and *Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305,

77 L.Ed. 641 (1933). Neither *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), nor *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), is to the contrary.

As the court states in Part III(D), the Supreme Court has recognized from the day *Ker* was decided that courts will enforce treaty provisions that limit the methods the United States may use to obtain custody of a criminal suspect. In *United States v. Rauscher,* 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), a companion case to *Ker,* the Court held that when the United States obtains custody over a defendant through the formal extradition process, it may not try the defendant for crimes other than the crime of extradition. *Id.* at 419–23, 7 S.Ct. at 240–42. The Court explicitly rejected the government's argument "that once being within the jurisdiction of [the United States], no matter by what contrivance or fraud[,] or by what pretence of establishing a charge provided for by the extradition treaty he may have been brought within the jurisdiction, he is, when here, liable to be tried for any offence against the laws as though arrested here originally." *Id.* at 422, 7 S.Ct. at 242; *see also Johnson v. Browne,* 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907) (applying *Rauscher* ).

In *Cook v. United States,* 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933), American officials boarded and seized a British vessel, Mazel Tov, and assessed a substantial fine against its master, Frank Cook. *Id.* at 107–08, 53 S.Ct. at 306–07. Cook argued the seizure violated a treaty between the United States and Great Britain regulating the boarding by United States officials of British vessels located in international waters. *Id.* at 109–11, 53 S.Ct. at 307–08. The Court agreed and held that because the seizure violated the treaty the United States was without jurisdiction to libel the vessel. *Id.* at 120–22, 53 S.Ct. at 311–12. As the Court said, "[t]o hold that adjudication may follow a wrongful seizure would go far to nullify the purpose and effect of the Treaty." *Id.* at 121–22, 53 S.Ct. at 312.

Together, *Rauscher* and *Cook* stand for the unsurprising proposition that the government of the United States may enter into a treaty regulating American extraterritorial law enforcement activities, and American courts are bound to enforce such a treaty as "the supreme Law of the Land." U.S. Const. art. VI, cl. 2.

*Ker* and *Frisbie* cannot reasonably be read to suggest otherwise. The Court in *Ker* held as a matter of treaty interpretation that the particular Peruvian treaty did not provide fugitives fleeing from justice in the United States with a guarantee of asylum if they safely reached Peru. *Ker,* 119 U.S. at 442, 7 S.Ct. at 228. As the Court has since observed, *Ker* involved no treaty violation; if the United States violates a treaty "the question is quite different." *Ford v. United States,* 273 U.S. 593, 606, 47 S.Ct. 531, 535, 71 L.Ed. 793 (1927). Since Article 9 of the Mexican–American Treaty clearly bars the United States from kidnapping a Mexican national like Verdugo in Mexico for trial in United States courts, the *Ker* holding is inapposite. *Frisbie,* as this court observes, also has no relevance to this case. It deals strictly with a claim that an interstate kidnapping violated the Due Process Clause and the Federal Kidnapping Act. *See* supra at 1347 (citing *Frisbie,* 342 U.S. at 520, 72 S.Ct. at 510).

In sum, Article 9 of the Mexican–American Extradition Treaty in itself barred the alleged abduction of Verdugo from Mexico.

## II

Although I agree with the court that the United States violated the Treaty if it kidnapped Verdugo, I cannot agree we may now decide either as a matter of law or of fact that Verdugo has a derivative right to rely upon that violation to bar his trial and conviction in a United States court. In my opinion that issue should be remanded to the district court for initial consideration.

As the majority recognizes, the rights at stake are Mexico's rights; any right Verdugo may have is entirely derivative. *See* supra at 1346–1347. The rights under the Treaty may be waived by Mexico over the defendant's objection, *see* supra at 1352;

*United States v. Valot,* 625 F.2d 308, 310 (9th Cir.1980), and Mexico's silence after a treaty violation will be construed as a waiver of its rights. *See supra* at 1352; *Matta–Ballesteros v. Henman,* 896 F.2d 255, 259–60 (7th Cir.1990); *United States v. Zabaneh,* 837 F.2d 1249, 1261 (5th Cir.1988); *United States ex. rel. Lujan v. Gengler,* 510 F.2d 62, 67–68 (2d Cir.1975). Verdugo's standing to seek repatriation because of the alleged treaty violation thus depends upon an assertion of that right by Mexico.

The court concludes that because Mexico protested the alleged kidnapping of Verdugo as a violation of the Treaty, Mexico necessarily, and as a matter of law, objected to Verdugo's trial and sought his return, thus preserving Verdugo's derivative standing to assert that right. Alternatively, the court finds that in fact Mexico did object to Verdugo's trial and did seek his return. Both of the court's rulings are premature and, in my opinion, ill advised.

The legal question the court decides and the factual issue it resolves were not squarely addressed by the district court. The district court rested its decision solely on the ground that a kidnapping by the United States would not violate the Mexican–American Extradition Treaty. The court did not address the legal question of whether Mexico's protest that the Treaty had been violated by Verdugo's alleged kidnapping was alone enough to give Verdugo standing to demand repatriation, nor did it decide whether Mexico had in fact demanded Verdugo's return.

Neither the legal nor the factual issue was briefed in this court until we ordered supplemental briefs. The briefs the parties than filed did not discuss the legal issue adequately or the factual issue at all.

We have discretion to remand a question of law to the district court when, as here, it has not been addressed by the district court, has not been properly briefed by the parties, and involves a question of first

impression, *see Badea v. Cox,* 931 F.2d 573, 575 n. 2 (9th Cir.1991); and we should do so in this instance. Factual issues, of course, are within the exclusive province of the district court and should be left to that court.

If these issues were easily resolved it might be permissible for this court to resolve them in the interest of judicial economy, but this is not the case.

The materials before us strongly suggest the court is mistaken in concluding a diplomatic protest necessarily and as a matter of law implies a reservation of all of a nation's treaty rights and a blanket objection to all criminal proceedings against the defendant. As the most recent Restatement of the foreign relations law of the United States explains:

> If a state's law enforcement officials exercise their functions in the territory of another state without the latter's consent, that state is entitled to protest and, in appropriate cases, to receive reparation from the offending state. If the unauthorized action includes abduction of the person, the state from which the person was abducted may demand return of the person, and international law requires that he be returned. *If the state from which the person was abducted does not demand his return, under the prevailing view the abducting state may proceed to prosecute him under its laws.*

*Restatement (3d) The Foreign Relations Law of the United States* § 432 comment c (1987) (emphasis added).[1]

Thus, it would appear that under international practice a nation's protest that its treaty rights have been violated by the manner in which custody of a criminal defendant was obtained does not in itself constitute an objection to the defendant's trial or a demand for his return.

---

1. Contrary to the majority's suggestion, *see supra* at note 22, Reporters' Note 3 of the Restatement is entirely consistent with the Restatement text. Reporters' Note 3 unambiguously states: Under the prevailing practice ... states ordinarily refrain from trying persons illegally

brought from another state only if that state demands his return.
*Restatement (3d) The Foreign Relations Law of the United States* § 432 Reporters' Note 3.

A review of the authorities confirms the Restatement view. In most cases, the offended nation does seek "the release or restoration of the person illegally carried away[ ]," and that relief is granted by the offending state. J.B. Moore, 1 *A Treatise on Extradition and Interstate Rendition* § 194 at 288 (1891).[2] However, nations do not always insist upon the dismissal of charges and repatriation of an abducted defendant. When this remedy is not requested it is not awarded. *See id.* § 193 at 287.

Thus, in the celebrated *Eichmann* case, Argentina initially insisted upon Eichmann's repatriation, but later determined not to do so in return for a concession by Israel that Argentina's sovereign rights had been violated by Eichmann's abduction. Because Argentina chose not to demand Eichmann's return, the Israeli court held Eichmann's kidnapping did not bar the exercise of jurisdiction over Eichmann. *See Attorney General v. Eichmann* (Dist.Ct. Israel 1961) *reprinted in* 36 Intl.L.Rep. 18, 63 (1968), *aff'd sub nom. Eichmann v. Attorney General* (Supreme Ct.Israel 1962) *reprinted in* 36 Intl.L.Rep. 277 (1968). Similarly, in the *Nogales* case, when Mexican soldiers "rescued" a Mexican prisoner from an American prison, the United States accepted Mexico's offer to punish the escaped prisoner and the kidnappers, rather than insisting upon the return of the prisoner. J.B. Moore, 1 *A Treatise on Extradition and Interstate Rendition* § 196 at 288–90. Again, when a Texas sheriff arranged the kidnapping of a fugitive in Mexico near Tombstone, Arizona, the Mexican government did not insist upon return of the fugitive, but demanded that the kidnappers be punished; the United States promised to do so. *Id.* § 193 at 287. An apology is all that was required

by the United States following the kidnapping of an American from Michigan by Canadian authorities. *See* J.B. Moore, IV *A Digest of International Law* § 603 at 329 (1906).

The most recent reported decision is that of the Supreme Court of Germany in # 19 GGART 25 *Verfahrenshindernis wegen Verletzung von Hoheitsrechten reprinted in* 1985 *Neue Zeitschrift fur Strafrecht* STZ 464. In this case, the defendant was arrested in the Netherlands by a German police officer and taken back to Germany to stand trial for theft. The Netherlands protested the abduction, but did not request the defendant's return. The German Supreme Court rejected the defendant's argument that his abduction divested the trial court of jurisdiction because it violated the Dutch–German extradition treaty and customary international law. The court held:

> There is no procedural obstacle [to trial] because of the manner in which the police arrested the accused. The violation of Dutch sovereign rights needs to be considered, according to Article 25 of the German Constitution [incorporating international law as part of German law], only if the Netherlands claims that its sovereignty has been violated and its claims oppose continuance of the criminal prosecution, and the Netherlands has demanded, without undue delay, repatriation of the accused.... No request was made by the Netherlands authorities although they had knowledge of the circumstances in which the accused was arrested. In a note from the Dutch Embassy dated December 20, 1983, no request was mentioned. According to that note, the "Dutch government considered

---

**2.** For example, in the *Bratton* case over a century ago, a Canadian national was kidnapped in Canada by Americans and brought to South Carolina for trial. The British government demanded that the charges be dismissed and Bratton be permitted to return to Canada. The United States complied. J.B. Moore, 1 *A Treatise on Extradition and Interstate Rendition* § 190 at 283–84. Similarly, in the *Blair* case, the United States insisted upon the return of an American citizen kidnaped by Great Britain and

the British government complied. *Id.* § 191 at 285. More recently, in *United States v. Caro–Quintero,* 745 F.Supp. 599 (C.D.Cal.1990), the government of Mexico demanded the return of the defendant following his kidnapping by paid agents of the United States, *id.* at 603–04, 608, and the district court ordered his return. *Id.* at 614. *Caro–Quintero* is currently on appeal before another panel of this court *sub nom. United States v. Alvarez–Machain,* No. 90–50459.

this incident a serious offense to Dutch sovereignty" and "requests the Foreign Department for an immediate reply" but [the note] did not include a repatriation demand.[3]

Because the issue was not explored in the district court and this court has not been aided by adequate briefing, we cannot be confident we are fully aware of the significance of a diplomatic protest that an abduction has violated a treaty. From the material cited, however, it appears possible if not probable that this court's holding that as a matter of law such a protest is equivalent to an assertion of the right under the treaty to terminate a criminal prosecution and repatriate the defendant, is contrary to prevailing diplomatic understanding and hence to the expectations of the protesting nation. As the United States has argued to this court, nations often lodge a formal protest only to vindicate their national dignity or satisfy domestic political concerns. Under the court's approach, a nation may not elect this option without also aborting the criminal proceeding in the offending nation and requiring return of an individual the offended nation may not wish (or may be unable) to bring to trial in its own courts.[4]

In addition to holding a protest alone is sufficient to trigger all of Mexico's potential rights under the Treaty, the court finds as a fact that Mexico intended to exercise its right to halt Verdugo's trial and require his return. The court rests this finding upon the subsidiary fact that Mexico asked the Department of State to inform the "U.S. judicial authorities" that Mexico had protested Verdugo's abduction as a violation of the Treaty. *See* supra at 1360.

Even if it were appropriate for an appellate court to resolve this factual issue, the record available to us is not adequate to permit us to do so. All we have before us is the text of two notes sent by Mexico to our State Department. We do not know the circumstances in which the notes were presented nor what other communication may have occurred between the two governments.

Moreover, the scanty record before us strongly indicates Mexico did not intend by its protest to seek Verdugo's return to Mexico for trial. This appears most clearly from a comparison of Mexico's protest in this case with its protest in a companion case involving Doctor Alvarez–Machain. *See United States v. Caro–Quintero,* 745 F.Supp. 599 (C.D.Cal.1990) (pending on appeal in this court *sub nom. United States v. Alvarez–Machain,* No. 90–50459).

After an evidentiary hearing, the district court in *Caro–Quintero* found the United States had hired Mexican citizens to abduct Dr. Alvarez–Machain and bring him to the United States for trial for his alleged role in the murder of Agent Camarena. *Id.* at 603.

Mexico's reaction was prompt and unambiguous. The abduction occurred on April 2, 1990. On April 18, 1990, Mexico requested our State Department to provide an official report on the role of the United States in the abduction. *Id.* Following the United States' response,[5] Mexico submitted a protest to the State Department dated May 16, 1990: The note stated:

The Government of Mexico considers that the kidnapping of Dr. Alvarez Ma-

---

3. Contrary to the majority's suggestion, *see* supra at note 22, the German court's conclusion that a repatriation request is required was not dictum. As the quoted text reveals, the lack of a repatriation request was essential to the court's holding. Nor was the German court's decision based upon the peculiarities of German constitutional law. Article 25 of the German constitution, relied upon by the German court, merely incorporates international law as part of German law. Thus, the German court's decision rests squarely upon the customary practice among nations.

4. The majority defends its bright line rule by suggesting that an inquiry into the actual intent of Mexico "comes dangerously close to the inquiries forbidden under the political question doctrine." Supra at note 22. The majority fails to explain why presuming, contrary to diplomatic practice, that Mexico's protest was intended as a demand for Verdugo's repatriation, is any less invasive of the executive sphere than determining whether in fact Mexico has demanded Verdugo's return.

5. This court does not have a copy of the United States' response.

chain and his transfer from Mexican territory to the United States of America were carried out with the knowledge of persons working for the U.S. Government, in violation of the procedure established in the extradition treaty in force between the two countries.

The note concluded:

> Consequently, the Embassy of Mexico, on the specific instructions of its Government, requests that the Department of State intercede with the appropriate authorities so that Dr. Alvarez Machain can be returned and investigated regarding possible participation in offenses, the investigation and prosecution of which are the responsibility of the Mexican Government. The Embassy therefore respectfully urges the U.S. Government to offer its cooperation so that the aforementioned individual can be tried and sentenced with absolute respect for Mexican laws for any offenses in which he may have been involved.[6]

Mexico's note of protest left no doubt Mexico sought the return of Dr. Alvarez–Machain for investigation and trial in Mexico in conformity with Article 9 of the Treaty. Moreover, on November 9, 1990, Mexico's Consul General in Los Angeles submitted a letter to this court reiterating Mexico's position that the Mexican–American Extradition Treaty required that Alvarez–Machain be returned to Mexico and urging this court to uphold the district court's ruling to that effect.

The contrast with Mexico's communications in the present case is striking, and may well be significant. In this case Mexico's first diplomatic note was dated three months after Verdugo's apprehension. It referred to newspaper reports that Verdugo had been abducted by Mexican police officers hired by the United States, and requested information regarding the incident. The United States responded that the apprehension of Verdugo was accomplished pursuant to a long-standing local practice of cooperation between law enforcement agents of the United States and Mexico, and that the Mexican police were not hired by United States authorities. After a silence of six months Mexico sent a second communication, noting that Judge J. Lawrence Irving, then presiding over Verdugo's trial on narcotics charges, had recently made a factual finding that the United States had hired Mexican police officers to kidnap Verdugo, contrary to the earlier representations of the United States. Mexico also noted Judge Irving found no treaty violation had occurred because Mexico had not protested Verdugo's abduction. Mexico requested "the kind mediation of the Department of State in informing the corresponding U.S. judicial authorities of the position of the Mexican Government so that this case will be properly clarified."

Mexico did not request Verdugo's return; it did not say it intended to investigate and try Verdugo pursuant to Article 9 of the Treaty. It asked only that the district court trying Verdugo on narcotics charges be advised that Mexico had objected to his abduction.

The United States responded by pointing out Mexico had misconstrued Judge Irving's findings—and that Judge Irving actually found, consistent with the United States' earlier representations to Mexico, that the United States had not paid the Mexican officers to kidnap Verdugo. The Department of State also advised Mexico that in accordance with Mexico's request district court had been informed that Mexico had protested the kidnapping. The note closed with assurances that the United States respected the territorial sovereignty of Mexico and that it had acted in good faith in the reasonable belief that delivery of Verdugo to the United States by Mexican officers reflected a law enforcement decision of the appropriate Mexican authorities. The note concluded: "The Depart-

---

**6.** Mexico's letter of protest was not part of the record below. However, a diplomatic protest is a public document of which we may take judicial notice. *See, e.g., United States v. Payton,* 918 F.2d 54, 56 (8th Cir.1990); *United States v. Jordan,* 913 F.2d 1286, 1287 n. 2 (8th Cir.1990); *Fibreboard Paper Prod. Corp. v. East Bay Union of Machinists, Local 1304,* 344 F.2d 300, 302 n. 2 (9th Cir.1965); *Zahn v. Transamerica Corp.,* 162 F.2d 36, 48 n. 20 (3d Cir.1947); *National Labor Relations Board v. E.C. Atkins & Co.,* 147 F.2d 730, 734 n. 1 (7th Cir.1945).

ment trusts that the foregoing clarifies any misunderstandings regarding this case, and looks forward to continued cooperation between the two governments on law enforcement matters." Following these assurances by the United States, the Director General of the Mexican Federal Judicial Police authorized a joint Mexican–American search of Verdugo's homes in Mexicali and San Felipe, Mexico. *United States v. Verdugo–Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 1059, 108 L.Ed.2d 222 (1990).

It may also be significant that Mexico's note of protest was lodged while Verdugo was facing trial on narcotics charges before Judge Irving in the Southern District of California, well over a year before this prosecution for murder began. So far as the record before us indicates, Mexico did not object to this proceeding against Verdugo for murder: Mexico remained silent when Verdugo was indicted on the present charges, remained silent when Verdugo went to trial, remained silent when Verdugo received an unfavorable ruling below on the treaty issue, and remained silent when Verdugo was convicted.

On the basis of this information, and such other evidence a properly developed record might contain, a trier of fact might agree with this court's finding that Mexico intended that this criminal proceeding be abated and Verdugo be returned to Mexico. However, a trier of fact could also conclude that Mexico intended only to protest a possible invasion of its territorial integrity and treaty rights; that it was satisfied with the explanation given by the United States and with the formal assurances by the United States that the United States respected Mexico's rights as a sovereign and as a party to the Treaty; and that Mexico was satisfied to allow Verdugo's trial and conviction to stand. The trial court should be allowed to decide which inference to draw.

For these reasons, I dissent.